**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| U.S.A. DAWGS, INC. and DOUBLE DIAMOND DISTRIBUTION, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> RONALD SNYDER, DANIEL HART, THOMAS J. SMACH, ANDREW REES, GREGG RIBATT, ANDREW REDDYHOFF, GEORGE B. BOEDECKER JR., LYNDON HANSON, DONALD LOCOCO, RAYMOND CROGHAN, RONALD FRASCH, MICHAEL MARGOLIS, JEFFREY LASHER, MICHAEL E. MARKS, PRAKASH MELWANI, JOHN P. McCARVEL, ERIK REBICH, SARA HOVERSTOCK, and JOHN AND JANE DOE DEFENDANTS 1-30, <br><br> Defendants. | Civil Action No. 16-CV-2004 |

---

**USA DAWGS, INC. AND DOUBLE DIAMOND DISTRIBUTION, LTD.'S**
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

---

U.S.A. Dawgs, Inc. ("USA Dawgs") and Double Diamond Distribution, Ltd. ("Double Diamond" or "DDD") (USA Dawgs and DDD are collectively referred to herein as "Plaintiffs" or "Dawgs"), by and through counsel, hereby file this Complaint against Ronald Snyder, Daniel Hart, Thomas J. Smach, Andrew Rees, Gregg Ribatt, Andrew Reddyhoff, George B. Boedecker Jr., Lyndon "Duke" Hanson, Donald Lococo, Raymond Croghan, Ronald Frasch, Michael Margolis, Jeffrey Lasher, Michael E. Marks, Prakash Melwani, John P. McCarvel, Erik Rebich,

1

Sara Hoverstock, and John and Jane Does 1-30, (collectively, "the Conspirator Defendants") and

allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against the Conspirator Defendants – Ronald Snyder,

Daniel Hart, Thomas J. Smach, Andrew Rees, Gregg Ribatt, Andrew Reddyhoff, George B.

Boedecer Jr., Lyndon "Duke" Hanson, Donald Lococo, Raymond Croghan, Ronald Frasch,

Michael Margolis, Jeffrey Lasher, Michael E. Marks, Prakash Melwani, John P. McCarvel, Erik

Rebich, Sara Hoverstock, and their yet-unnamed accomplices, John and Jane Does 1-30, each of

whom personally has knowingly played an active, role in the unlawful conspiracy and scheme

that has resulted in Crocs, Inc.'s ("Crocs") monopolization of the relevant market – and seek an

injunction and to recover damages associated with anticompetitive conduct, monopolization,

attempted monopolization, conspiracy to restrain trade, conspiracy to monopolize, unlawful

exclusion, false advertising and intentional interference with business relationships.

a.      Double Diamond and USA Dawgs allege that the unlawful scheme

eliminated any real competition to Crocs and enabled the named Conspirator Defendants (and

other yet-unidentified and yet-unnamed accomplices) to set, fix, and charge supracompetitive

prices for the Crocs clogs that resulted in the overpayment of more than $1 billion by consumers

across the United States since 2006.  This scheme resulted in the unjust enrichment of the named

Conspirator Defendants by more than $350 million, collectively.

b.      Unless enjoined, it is estimated that the continuation of this conspiracy and

scheme will result in an additional $1 billion or more in overcharges to American consumers

over the next seven years. Under the antitrust laws, individuals who actively participate in these

types of unlawful acts – including those who actively and knowingly directed, supervised, participated in, cooperated with, authorized, sanctioned and/or acquiesced in the conduct – can be held personally liable, jointly and severally, for all damages incurred (which is estimated to exceed $1 billion).

## SUMMARY OF THE CASE

2.      This lawsuit centers around the deliberate and continuing attempt to monopolize, and the actual monopolization of, the relevant market by, for and through Crocs, Inc., the named Conspirator Defendants and their yet-unidentified accomplices.[1] Upon information and belief,

---

[1] This action is directly related to a litigation currently pending in the United States District Court for the District of Colorado under civil action number 06-cv-00605-PAB-KMT (the "2006 Lawsuit"), and Dawgs fully expects that this action will be joined or consolidated with the 2006 Lawsuit, which has just entered the discovery phase of the case. Dawgs filed this separate, related action against the named Conspirator Defendants, who fit within the categories of John Doe Defendants described and identified by Dawgs in their claims against Crocs, its cofounder Scott Seamans ("Seamans") and John Doe Defendants 1-100 in the 2006 Lawsuit in an abundance of caution.  Dawgs is concerned that one or more of the named Conspirator Defendants may argue that the statute of limitations expired on August 6, 2012 (with respect to certain anticompetitive conduct), since Crocs first asserted patent infringement claims against USA Dawgs on August 6, 2012.  While Dawgs has repeatedly requested that Crocs provide discovery related to the individuals who played any role in the conduct alleged in the 2006 Lawsuit that comprised the conspiracy and scheme to violate the antitrust laws, Crocs has delayed turning over the documents and information (and has failed to fulfill its obligations under the schedule set by the Court and the applicable rules).  As it told the Court at a conference in May 2016, Dawgs fully intended to utilize Crocs' disclosures to amend its counterclaims (and the associated caption) in the 2006 Lawsuit once Dawgs was able to confirm the particular identities of the John Doe Defendants.  Because of Crocs' continuing delays, it would have been impossible for Dawgs to seek and receive leave from the Court to timely amend the caption and pleadings in the 2006 Lawsuit.  Hence, this separate action against the named Conspirator Defendants was filed.  Dawgs reserves the right to seek to amend this complaint to add as defendants yet-unnamed accomplices once their identities and particular actions taken in furtherance of the conspiracy and scheme are revealed during the discovery process. The phrase "Conspirator Defendants" as used herein, includes Seamans, the individual defendants named herein and any yet-unidentified accomplices or conspirators who actively and knowingly directed, supervised, participated in, cooperated with, authorized, sanctioned, ratified, and/or

Crocs possesses a market share exceeding 90% in the market for molded clog-type footwear sold in the United States, which monopoly power has been acquired and maintained unlawfully by and through the conduct of the Conspirator Defendants and their yet-unidentified accomplices.

a.   Crocs has monopolized, or at least attempted to monopolize, the relevant market for molded clog-type footwear products by accumulating patents, no matter how weak or narrow, through the submission of false oaths and affidavits, and without disclosing the true inventorship thereof, or its knowledge of the prior art or prior sales to the U.S. Patent Office.

b.   Crocs then asserted these ill-gotten (and ill-maintained) patent rights far beyond the narrow scope of the actual patent claims by instituting a series of sham, predatory, and baseless lawsuits premised on invalid and/or unenforceable patents in order to slowly and/or aggressively litigate its competition out of the market.

c.   Crocs continues to benefit from its sham lawsuits – including the still-pending 2006 Lawsuit and yet another lawsuit just filed on June 10, 2016 against one of Dawgs' largest retailer customers, even while Crocs perpetrates further inequitable conduct on the U.S. Patent Office during ongoing patent reexamination proceedings.  The baseless, bad-faith and predatory patent infringement actions, initiated and prosecuted by Crocs and other accompanying anticompetitive conduct, constitute violations of the antitrust laws.

d.   The named Conspirator Defendants are among those individuals who actively and knowingly directed, supervised, participated in, cooperated with, authorized, sanctioned, ratified and/or acquiesced in the unlawful course of conduct that gives rise to Dawgs'

---

acquiesced in the conduct that gives rise to Dawgs' antitrust, Lanham Act and business tort claims.

antitrust, Lanham Act and business tort claims, and who personally benefited from the illegal scheme.

3.       The Conspirator Defendants conceived of and implemented a multi-faceted anticompetitive scheme to exclude all of Crocs' actual and potential competitors, including Dawgs, from this growing and lucrative market (or as one Crocs executive exclaimed, intending to "wipe them off the face of the earth"). The prospectus that Crocs filed with the SEC in August 2006, attached hereto as Exhibit B and incorporated by reference herein, confirms that the procurement, maintenance and broad, aggressive enforcement of the patents that Seamans claimed to have invented were key components of Crocs' business strategy.  Contrary to Crocs' claims, it did not invent the molded clog-type shoe and it was not even the first company to "put the holes in the shoe."  Compare Exhibit C with Exhibit D, a prior art patent.  By 2006, Dawgs had already developed, manufactured, and began to sell a line of competing and significantly lower-priced molded clog-type footwear products.  Both USA Dawgs and Double Diamond, one of the first companies sued by Crocs in 2006, have been severely restrained and constrained by the unlawful conspiracy and scheme.  To eliminate lower-priced competition from Dawgs and other actual or potential competitors, Crocs has, through by or with the active conduct of the Conspirator Defendants, engaged in a campaign that, upon information and belief, consists of at least the following anticompetitive and monopolistic acts:

a.       knowingly obtaining – including, by submitting false oaths to the Patent Office misrepresenting the inventorship thereof, and by knowingly failing to disclose material prior art and prior sales – and enforcing fraudulently procured patents;

b.       using knowingly sham and predatory patent infringement litigation to

eliminate and thwart competitors;

        c.     knowingly using invalid patents to secure a General Exclusion Order preventing the importation of competitive products;

        d.     threatening or actually refusing to deal with distributors, retailers or others carrying, or considering carrying, Dawgs' footwear products and/or any products offered by Dawgs or others that are "similar" to Crocs' products and entering into actual and de facto exclusive arrangements with key retailers and other resellers;

        e.     knowingly making false statements under oath to the U.S. Patent Office during patent reexamination proceedings in an attempt to maintain its monopoly;

        f.     knowingly making and disseminating false statements about Dawgs and other competitors (and their products), the enforceability and scope of the Crocs patents, and the superiority and uniqueness of the "[non-]patented", "[not-]proprietary" Croslite material that is used to make Crocs' molded clog-type footwear;

        g.     intentionally interfering with Dawgs' business relationships with actual and potential customers, including a second lawsuit that Crocs commenced on June 10, 2016 against CVS (who, prior to Crocs' interference, was one of Dawgs' largest customers), ostensibly seeking to enforce patents in a baseless lawsuit, including one patent that the patent office has twice rejected during reexamination, including in an Action Closing Prosecution mailed on February 11, 2016 as a result of Dawgs' initiation of a reexamination proceeding.  The Action Closing Prosecution is attached hereto as Exhibit E, and incorporated by reference herein.

      4.     As a consequence of the unlawful conduct alleged herein, competition in this product market has been suppressed and virtually eliminated, and consumers in this market have

suffered a loss of choice and have been required to pay higher, supra-competitive prices for Crocs' molded clog-type footwear than would otherwise be the case in a properly functioning and competitive market. In particular, through its conduct, and the conduct of the Conspirator Defendants, Crocs has gained the power to exclude competitors and control price in the market. Upon information and belief, consumers have already overpaid hundreds of millions, if not billions, of dollars to purchase Crocs' molded clogs at supracompetitive prices.  Dawgs, the competitive market, and consumers have all suffered antitrust injury by reason of the unlawful, exclusionary, and trade-restraining conduct of Crocs and the Conspirator Defendants. The Conspirator Defendants have themselves been unjustly enriched from the conspiracy and scheme in an amount that Dawgs believes totals well in excess of $350 million.[2]

### PARTIES

5.      USA Dawgs, Inc. is a corporation organized under the laws of the State of Nevada with its principal place of business at 4120 W. Windmill Lane, Unit 106, Las Vegas, Nevada, 89139.

6.      Double Diamond Distribution, Ltd. is a corporation organized under the laws of Saskatchewan with its principal place of business at 3533 Idylwyld Drive North, Bay A,

---

[2] Attached hereto as Exhibit A, and incorporated by reference herein, is a chart detailing, for each of the Conspirator Defendants individually, the amount that Dawgs believes that each of them received when they sold Crocs shares over time, totaling $350 million.  This information in this chart is taken directly from Crocs' own public filings with the Securities & Exchange Commission, the relevant excerpts of which are attached hereto as Exhibit A, and incorporated herein.  Upon information and belief (based upon the Crocs SEC filings), the total approximate sales for each individual, as reported, is as follows:  Thomas J. Smach, $10 million; Daniel Hart, $3 million; George B. Boedecker Jr., $22 million; Raymond Croghan, $39 million; Ronald Frasch, $2 million; Jeffrey Lasher, $900,000; Michael E. Marks, $103 million; John P. McCarvel, $19 million; Ronald Snyder, $130 million; Michael Margolis, $26 million.

Saskatoon, Saskatchewan S7L 6B5, Canada.

a.      For simplicity's sake, except where there is a significant and material difference between the two companies with respect to the statement then being made, USA Dawgs and Double Diamond are referred to herein, both collectively and singly, as "Dawgs." This should not be interpreted or construed as an admission that these distinct legal entities are alter egos.

b.      Dawgs is two, small, family owned companies with overlapping ownership that have been gravely injured by Crocs' illegal activities and are two of the few actual competitors left in the market that Crocs has monopolized.

7.      Upon information and belief, Crocs, Inc. is a Delaware corporation with its principal place of business located at 6273 Monarch Park Place, Niwot, Colorado 80503. Crocs is not named as a defendant in this action because it was already named as a counterclaim defendant in the ongoing 2006 Lawsuit which Dawgs expects to be consolidated or joined with this action.

8.      Seamans is a co-founder of Crocs and the sole listed inventor on U.S. Patent No. 6,993,858 ("the '858 patent") and U.S. Patent No. D517,789 ("the '789 patent"). Seamans has also signed declarations under the penalty of perjury that were submitted to the U.S. Patent Office in connection with efforts to obtain the '858 patent and the '789 patent and during the course of the reexamination of the '789 patent. Upon information and belief, Seamans worked for Crocs in various roles starting in 2002. Upon information and belief, by 2013, Seamans was no longer employed by Crocs, and conspired with Crocs after his employment ended. Upon information and belief, Seamans presently resides at 5082 Mycena Way, Oceanside, California.

a.      Seamans is not named as a party to this action because he was already named as a Defendant in the ongoing 2006 Lawsuit (which action Dawgs expects to be consolidated or joined with this action).

b.      It was publicly reported that Seamans and the two other individuals who founded Crocs were among the fifteen richest inventors in history, having amassed $1 billion from their Crocs holdings.  *See* Exhibit F, annexed hereto, and incorporated herein by reference.

c.      According to the Crocs SEC filings, Seamans received more than 750,000 shares of stock that were worth more than $20 million in 2006 and would have been worth approximately $57 million at the stock highpoint, October 31, 2007.  This is set forth in Exhibit B and Exhibit G, both of which are attached hereto and incorporated by reference.

d.      The ill-gotten patents were the key to potential success, according to Crocs' own SEC filings.  For example, Crocs stated in a 2006 SEC filing that "other footwear companies have introduced products that are substantially similar to our footwear models, which may reduce sales of our footwear products … our retail customers purchase similar products sold by our competitors," and, "We face significant competition and if we are unable to compete effectively, sales of our products may decline and our business could be harmed," and "Some of our competitors are offering products that are substantially similar in design and materials to crocs-branded footwear."  Exhibit B.

e.      Upon information and belief, Seamans claims to be the "sole inventor" of the '858 and '789 patents was false, and he knew it to be false when he submitted declarations containing that claim to the patent office.  Upon information and belief, Seamans has made other false claims of inventorship to the patent office.  For example, in U.S. Patent Application No.

10/803,569, which was published as U.S. Patent Application Publication No. US 2004/0231191 A1, in an application entitled "Footwear Molds," Seamans claimed to have invented a footwear mold. Seamans claims were rejected by the Patent Office Examiner as footwear molds were long well-known when Seamans sought to obtain a patent directed to the same.

9. Certain defendants are individuals who ordered or authorized Crocs to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit on August 6, 2012, and/or are some of the individuals who directed, participated in, sanctioned, ratified, or acquiesced in the decision to do so and then to continue the 2006 Lawsuit at various times through the present, as follows:

a. Raymond D. Croghan ("Croghan") was a Director of Crocs from 2004 through 2015. Upon information and belief, as a member of the Crocs Board of Directors, Croghan ordered, authorized, participated in, ratified or acquiesced to Crocs decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in in the 2006 Lawsuit in 2012. Croghan was awarded and has sold Crocs common shares in an amount exceeding $39,103,573 from 2006 to present. Exhibit A. Upon information and belief, Croghan is a resident of Phoenix, Arizona.

b. Ronald L. Frasch ("Frasch") has been a Director of Crocs since October 2006. Upon information and belief, as a member of the Crocs Board of Directors, Frasch ordered, authorized, participated in, ratified or acquiesced to Crocs decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit in 2012. Frasch was awarded and has sold Crocs common shares in an

amount exceeding $1,884,895 from 2007 to present. Exhibit A. Upon information and belief, Frasch is a resident of New York, New York.

c.      Daniel Hart ("Hart") has been employed by Crocs since June 2009 and is Crocs' Chief Legal and Administrative Officer. As Chief Legal and Administrative Officer, Hart ordered, authorized, participated in, ratified or acquiesced to the decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit in 2012. Hart was awarded and has sold Crocs common shares in an amount exceeding $3,356,075 from 2010 to present. Exhibit A. Upon information and belief, Hart is a resident of Denver, Colorado.

d.      Sara Hoverstock ("Hoverstock") has been employed by Crocs since June 2005, serving in various legal and business roles including Associate General Counsel, Intellectual Property. Upon information and belief, as Associate General Counsel, Intellectual Property, Hoverstock ordered, authorized, participated in, ratified or acquiesced to Crocs decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit in 2012. Upon information and belief, Hoverstock is a resident of Boulder, Colorado.

e.      Jeffrey Lasher ("Lasher") was employed by Crocs from June 2009 through October serving in various financial roles including Chief Financial Officer. Upon information and belief, as Chief Financial Officer, Lasher ordered, authorized, participated in, ratified or acquiesced to Crocs decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit in 2012. Lasher was

awarded and has sold Crocs common shares in an amount exceeding $890,892 from 2011 to present. Exhibit A. Upon information and belief, Lasher is a resident of Denver, Colorado.

   f. John P. McCarvel ("McCarvel") was employed by Crocs from January 2005 through April 2014, serving in various executive capacities including Chief Executive Officer. Upon information and belief, as Chief Executive Officer, McCarvel ordered, authorized, participated in, ratified or acquiesced to Crocs decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit in 2012. McCarvel was awarded and has sold Crocs common shares in an amount exceeding $19,383,305 from 2006 to present. Exhibit A. Upon information and belief, McCarvel is a resident of Colorado.

   g. Thomas Smach ("Smach") has been a Director of Crocs since 2005 and currently is the Chairman of the Board of Directors. Upon information and belief, as Chairman of the Board of Directors, Smach ordered, authorized, participated in, ratified or acquiesced to Crocs decision to sue USA Dawgs, which resulted in USA Dawgs being named as a defendant in Crocs' First Amended Complaint in the 2006 Lawsuit in 2012. Smach was awarded and has sold Crocs common shares in an amount exceeding $10,351,411 from 2007 to present. Exhibit A. Upon information and belief, Smach is a resident of Menlo Park, California.

   10. Certain defendants are individuals who ordered or authorized Crocs to sue CVS, which resulted in the initiation of Civil Action No. 12-cv-02096 in the United States District Court in the District of Colorado, and/or the individuals who participated in, ratified, or acquiesced to Crocs' decision to do so.  Those individuals include: Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, and Smach.

11.    Certain defendants are individuals who ordered or authorized the filing of a

declaration of Seamans in Reexamination Control No. 95/002,100 in the U.S. Patent Office, filed

on July 29, 2013, and/or the individuals who participated in, ratified, or acquiesced to Crocs'

decision to do so.  Those individuals include: Croghan, Frasch, Hart, Hoverstock, Lasher,

McCarvel, and Smach.

12.    Certain defendants are individuals who have, at all times between 2006 and the

present, ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent

against Double Diamond, USA Dawgs, and CVS, despite their knowledge that both of the

patents are invalid and/or unenforceable, and/or the individuals who participated in, ratified, or

acquiesced to Crocs' decision to do so.  Those individuals include: Croghan, Frasch, Hart,

Hoverstock, Lasher, McCarvel, Smach, as well as:

a.    George B Boedecker, Jr. ("Boedecker") is a co-founder of Crocs, was

Crocs Chief Executive Officer from July 2002 through December 2004, and was a Director of

Crocs until May 24, 2006 and, upon information and belief, was and is a shareholder of Crocs,

Inc. Upon information and belief, Boedecker ordered or authorized Crocs to assert the '858

patent and the '789 patent against Double Diamond, despite his knowledge that both of the

patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to

Crocs' decision to do so. Boedecker was awarded and has sold Crocs common shares in an

amount exceeding $21,953,337 from 2006 to present. Exhibit A. Upon information and belief,

Boedecker is a resident of Boulder, Colorado.

b.    Lyndon "Duke" Hanson ("Hanson") is a co-founder of Crocs, was Crocs

Chief Operating Officer from July 2002 through January 2005, and upon information and belief

was and is a shareholder of Crocs. Upon information and belief, Hanson ordered or authorized Crocs to assert the '858 patent and the '789 patent against Double Diamond, despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Hansen was awarded more than 880,000 Crocs shares. Exhibit B. Upon information and belief, Hanson is a resident of Boulder, Colorado.

   c.  Donald Lococo ("Lococo") is a senior officer of Crocs, serving in a variety of positions including as its director of investor relations and, upon information and belief, was and is a shareholder of Crocs. Upon information and belief, Lococo ordered or authorized Crocs to assert the '858 patent and the '789 patent against Double Diamond, despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Lococo was awarded more than 467,000 Crocs common shares. Exhibit B.  Lococo is quoted as proudly describing Crocs aggressive strategy to eliminate competition as having "eliminated [its competition] from the face of the Earth." A copy of the article "If the foam shoe fits: could 50 million Crocs fans be wrong?" dated February 1, 2008, is attached hereto as Exhibit C and is incorporated by reference herein. At present, Plaintiffs are not aware of the whereabouts of Lococo.

   d.  Michael Margolis ("Margolis") the Vice President of Sales and Marketing for Crocs starting in January 2005. Upon information and belief, as a senior officer of Crocs, Margolis ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond, despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Margolis was awarded and has sold Crocs common shares in an amount exceeding $26 million

from February 2006 to present. Exhibit A. Upon information and belief, Margolis is a resident of Denver, Colorado.

e.      Michael Marks ("Marks") was a director of Crocs from 2004 through 2008. Upon information and belief, as a member of the Crocs Board of Directors, Marks ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond, despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Marks was awarded and has sold Crocs common shares in an amount exceeding $103,318,712 from 2007 to present. Exhibit A. Upon information and belief, Marks is a resident of San Francisco, California.

f.      Prakash Melwani, ("Melwani") has been a director of Crocs since 2014. Upon information and belief, Melwani ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond, USA Dawgs and CVS despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Melwani is a senior managing director and chief investment officer of The Blackstone Group, L.P, according to its website "one of the world's leading investment firms" with $356 billion under management. Among Blackstone's assets is its $200 million investment in Crocs in December 2013, as a result of which Melwani became a director of Crocs. Upon information and belief, Melwani is a resident of New York, New York.

g.      Erik Rebich ("Rebich") was employed by Crocs from January 2004 through December 2009 and held the position of Vice President, Secretary and General Counsel. Upon information and belief, Rebich ordered or authorized Crocs to continue asserting the '858

patent and the '789 patent against Double Diamond, despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. According to Crocs' SEC filings, Rebich was awarded 222,913 Crocs shares.  Exhibit B.  Upon information and belief, Rebich is a resident of Colorado.

   h.  Andrew Reddyhoff ("Reddyhoff") was founder of FinProject, N.A. (later Foam Creations, Inc.) and has been its President since 1997. Foam Creations was purchased by Crocs in 2004 and Reddyhoff remained its president and an officer of Crocs. Thereafter Foam Creations was sold by Crocs in 2008 and Reddyhoff remains its president. Upon information and belief, Reddyhoff ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. According to Crocs' SEC filings, Reddyhoff was awarded 149,272 Crocs shares.  Exhibit B. Upon information and belief, Reddyhoff is a resident of Quebec, Canada.

   i.  Andrew Rees ("Rees") has been a director and the President of Crocs since 2014. Upon information and belief, Rees ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond, USA Dawgs and CVS despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Upon information and belief, Rees is a resident of Massachusetts.

   j.  Gregg Ribatt ("Ribatt") has been a director and the Chief Executive Officer of Crocs since 2015. Upon information and belief, Ribatt ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond, USA Dawgs and

CVS despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Ribatt was the president and chief executive officer of Collective Brands in 2006 when Crocs sued Collective Brands for infringement of the '858 patent and the '789 patent at the same time Crocs sued Double Diamond. After entering into a settlement agreement with Crocs and being dismissed from the infringement proceedings, in 2014 Ribatt joined The Blackstone Group, L.P. as a Senior Advisor, and ultimately became a director of Crocs and then its Chief Executive Officer.  Upon information and belief, Ribatt is a resident of Massachusetts.

   k.  Ronald R. Snyder ("Snyder") was the Chief Executive Officer and a director of Crocs from June 2004 through March 2009. Upon information and belief, Snyder ordered or authorized Crocs to continue asserting the '858 patent and the '789 patent against Double Diamond despite his knowledge that both of the patents are invalid and/or unenforceable, and/or he participated in, ratified, or acquiesced to Crocs' decision to do so. Snyder was awarded and has sold Crocs common shares in an amount exceeding $129,391,648 from 2006 to present. Exhibit A. Upon information and belief, Snyder is a resident of Boulder, Colorado.

   13.  Certain individuals have threatened, intimidated, convinced, or coerced, or have authorized, ordered, or directed other individuals to threaten, intimidate, convince, or coerce actual or potential purchasers of Plaintiffs' footwear products not to deal with Plaintiffs, including the individuals who have either themselves or authorized, directed, or ordered others (or have participated in, ratified or acquiesced to those others acts) enter into actual or de facto/implied exclusive dealing arrangements with any actual or potential purchasers of Plaintiffs' footwear products.   Those individuals include: Boedecker, Hanson, Croghan, Frasch,

Hart, Hoverstock, Lasher, Lococo, Marks, Margolis, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach and Snyder.

14.     Upon information and belief, by virtue of their active, knowing conduct and participation in the conspiracy and scheme alleged, the Conspirator Defendants may each be held personally liable for all of the damages caused by the conspiracies and monopolization scheme alleged based on two different principles of law (which apply to different groups of individuals):

a.     Individuals who actively and knowingly directed, supervised, participated in, cooperated with, authorized, sanctioned, ratified and/or  acquiesced in the unlawful course of conduct that gives rise to Dawgs' claims of attempted monopolization and monopolization under Section 2 of the Sherman Act (Claims 1 and 2 herein), of exclusive arrangements with retailers in violation of Section 3 of the Clayton Act (Claim 5 herein), false advertising in violation of the Lanham Act (Claim 7),  and intentional interference with business relations (Claim 6) are liable under such causes of action.  Those Conspirator Defendants who fall within this category include: Snyder, Hart, Rees, Ribatt, Reddyhoff, Boedecker Jr., Hanson, Lococo, Croghan, Frasch, Margolis, Lasher, Marks, Melwani, McCarvel, Reibich, Hoverstock, and John and Jane Does 1 through 30.

b.     Individuals who participated in, cooperated with, authorized, sanctioned, ratified and/or acquiesced in the unlawful course of conduct that gives rise to Dawgs' claims of conspiracy to restrain trade in violation of Section 1 of the Sherman Act (Claim 3) and conspiracy to monopolize in violation of Section 2 of the Sherman Act (Claim 4), at any point and who are not immunized by the intraenterprise exemption (the general principle that

individuals who are employees, officers or directors of the same company are legally incapable of conspiring with one another), because of one of the two following exceptions:

i.      Individuals, including Seamans, Reddyhoff, and John and Jane Does 1 through 30, who participated in the conspiracy at a time when they were not employees, officers or directors of Crocs; or

ii.      Individuals, who, by virtue of their independent personal interest in the conspiracy are liable under such causes of action. There are two subcategories of such individuals, as follows:

(1)      Those Conspirator Defendants whose independent personal interest in the conspiracy is attributable to their ownership of other entities include: Reddyhoff, Boedecker, Seamans, Hanson, and John and Jane Does 1 through 30.

(2)      Those Conspirator Defendants whose independent personal interest in the conspiracy is attributable solely to the fact that the conspiracy was designed to personally enrich the individual conspirators and who received personal benefits of such magnitude that it would be unconscionable to allow them to be covered by the independent personal interest include: Snyder, Hart, Smach, Boedecker, Hanson, Croghan, Frasch, Marks, McCarvel, and John and Jane Does 1 through 30.

## JURISDICTION AND VENUE

15.      These claims are filed, *inter alia*, under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against these individual Defendants for their past and continuing violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 3 of the Clayton Act (15 U.S.C. § 14), as alleged herein.

16.     This Court has original and exclusive jurisdiction over the subject matter of this civil action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1332, 1337, 1338, 1367, 2201, and 2202. Further, upon information and belief, the unlawful acts alleged herein were performed and occurred in material part within this District.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) as Crocs is a corporate resident of this judicial district, the individual defendants each are affiliated with Crocs by nature of their positions as officers, directors, employees or agents of Crocs and each either reside in this judicial district or at all times material to this Complaint have resided in this judicial district or have directed the affairs, decisions and activities of Crocs in this judicial district.

## INTERSTATE COMMERCE

18.     The actions complained of herein have and continue to restrain and adversely affect interstate commerce in that Crocs sells its products and services across state lines.  Further, upon information and belief, Crocs purchases goods and supplies in interstate commerce.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

19.     The anticompetitive and exclusionary practices implemented by Crocs by and through the named defendants induced retailers, distributors, and wholesalers not to do business with or purchase footwear products from Plaintiffs or other actual or potential competitors.  As a direct and proximate result of Crocs' unlawful conduct, various retailers, distributors or wholesalers have refused to deal with Plaintiffs and, upon information and belief, with other actual or potential competitors, and have cancelled pending and future orders.

A.    **Origin of the Molded Clog Shoe**

20.    Crocs is the leading manufacturer and seller of a wide variety of molded clog-type footwear products. Crocs has been engaged in the manufacturing and sale of a variety of footwear products including, predominantly, molded footwear made with a rubber-like polymer called ethyl vinyl acetate (EVA) in the shape of a clog since 2002.  To launch their company, the founders of Crocs, including Seamans, Boedecker and Hanson decided to market the exact shoe that had already been developed and was already being manufactured and distributed by Foam Creations, Inc. (previously known as FinProject, N.A., a Canadian company) ("FOAM") since at least 2000.  Upon information and belief, both Foam Creations, Inc. and FinProject, N.A. are predecessors to or otherwise related entities to Crocs.  Reddyhoff, on FOAM's behalf had obtained the design to the molded clog-type shoe (the "Battiston Molded Clog") and the molds for manufacturing it from Ettore Battiston of the Italian plastics design corporation L'Artigiana Stampi.  For example, an affidavit from Mr. Battiston confirming that he invented the strapless portion of the clog is attached hereto as Exhibit H, and is incorporated by reference herein. Reddyhoff and FOAM named the Battiston Molded Clog the "AquaClog."  In 2004, FOAM acquired the copyrights to the design through a written copyright assignment between Finproject N.A. and L'Artigiana Stampi executed by Battiston and Reddyhoff. A copy of the Battiston Copyright Assignment Agreement, is attached hereto as Exhibit I and is incorporated by reference herein.  Beginning in approximately 2000, Reddyhoff and FOAM manufactured and supplied the Battiston Molded Clog shoe to a number of retailers who then sold the shoe inside and outside of the United States under various names including: Explorer, Waldies, and others. Upon information and belief, Reddyhoff and FOAM were aware that the Explorer and Waldies

were being sold in the United States.  FOAM itself distributed and sold the Battiston Molded

Clog with the model name AquaClog under a FOAM house-brand called Rebound.

21.     Nor was the Battiston Molded Clog the only rubber-like polymer clog available in

the U.S. prior to 2002. Among others, BIHOS S.R.L., an Italian shoe designer and manufacturer

("BIHOS") had been distributing molded clog-type footwear under the Calzuro brand since at

least the mid-1980s ("Calzuro Molded Clog").  No later than 2001, Calzuro Molded Clogs

featuring a pivoting strap were offered for sale and sold in the United States.  One example of the

offer for sale of Calzuro Molded Clogs featuring a pivoting strap in the United States is included

in Exhibit J attached hereto and incorporated by reference herein.  A picture of the Calzuro

Molded Clog side-by-side with Crocs' beach clog is included as Exhibit K attached hereto and

incorporated by reference herein.

22.     Since 2002, Crocs has been misleading the public and consumers by claiming that

their footwear is made of an exclusive and proprietary closed-cell resin that they call "Croslite,"

when, in fact, "Croslite" is merely the common ethyl vinyl acetate used by many footwear

companies around the world, including Double Diamond, USA Dawgs, FOAM, and, upon

information and belief, many others.  Crocs continues to make the same claims today.  For

example, Crocs has consistently and persistently falsely claimed in promotional materials over

the course of thirteen years, that Crocs owns patent rights in the "Croslite material, including for

example the statement on its website that "Built for your job with the comfort of our patented

Croslite[TM] material, Crocs comfortable work shoes help support your feet for those long hour

shifts."  A copy of Crocs website http://www.crocs.com/c/shop-by/activity/work-shoes as of

June 8, 2016, is attached hereto as Exhibit L and is incorporated by reference herein. This

statement was recently removed by Crocs after Crocs received a copy of Dawgs' First Amended

Answer and Counterclaims in the 2006 Lawsuit where this statement was included. However,

Crocs has purposefully and with the knowledge that its statements are false, made many such

false statements, including notoriously publicizing and promoting the false claim that the

"Croslite" is a patented material in their own company news releases, for example Crocs made,

publicized, promoted and continues to publish and promote the false statement that "The Crocs

@ Work™ collection is built with the patented Croslite™ material." A copy of Crocs news

release dated April 11, 2013, as currently found on Crocs website is attached hereto as Exhibit M

and is incorporated by reference herein. As a further example, Crocs presently claims in

promotional materials including on its website that "Complete with our proprietary Croslite™

material foot bed, these lightweight shoes keep up with you whether you're running around the

restaurant or standing for long periods of time."  A copy of Crocs website

http://www.crocs.com/c/shop-by/activity/restaurant-shoes as of August 5, 2016, is attached

hereto as Exhibit N and is incorporated by reference herein. As a further example, Crocs

presently claims on its website that "All Crocs™ shoes feature Croslite™ material, a proprietary,

revolutionary technology . . ." A copy of Crocs website http://company.crocs.com as of August

5, 2016, is attached hereto as Exhibit O and is incorporated by reference herein.  Upon

information and belief, each of these statements is false or misleading, as Crocs does not own

any exclusive, proprietary, or patent rights to the materials from which its footwear are made.

Upon information and belief Reddyhoff, Seamans, Boedecker, Hanson and others have known

since the inception of Crocs that the material known as "Croslite" could not have been patented

by Crocs as it was a material developed and used by (at least) Reddyhoff and FinProject years

23

before Crocs existed.  For example, it was well-known by industry insiders that Croslite was neither unique to Crocs nor Crocs' property.  In one publication, attached as Exhibit C, a person with knowledge of the industry stated that "Crocs' 'trade-secret' Croslite is a basic foam material that is widely available from DuPont."

23.      By Fall 2002, at the latest, Reddyhoff and FinProject shipped shoes to Seamans, Boedecker and Hanson and, as Crocs, Seamans, Boedecker and Hanson sold shoes based on the designs by Battiston. Seamans, Boedecker, Hanson and Crocs marketed, promoted, and sold hundreds of pairs of its "Beach" model shoe at the Ft. Lauderdale Boat Show in Fall 2002. Crocs' "Beach" model was in fact Reddyhoff and FOAM's shoes bearing the Rebound name, which had been designed by Battiston.  Prior to selling these clogs, with the Rebound name imprinted on the bottom, Seamans, Boedecker, Hanson and Crocs added a sticker to these shoes that included the Crocs logo.

24.      Double Diamond and USA Dawgs have been manufacturing and selling a variety of footwear, including molded clog-type footwear in Canada since 2005 and in the United States since 2006.  Double Diamond has sold footwear in the United States under the brand name DAWGS and USA Dawgs has sold footwear in the United States under the brand names DAWGS, DOGGERS, and HOUNDS.

**B.      Crocs' Purported Patents**

25.      On February 7, 2006, the U.S. Patent Office issued the '858 patent, entitled "Breathable Footwear Pieces," with Crocs listed as the assignee, and Crocs' co-founder Seamans listed as the sole inventor.  The '858 patent contains diagrams and descriptions of, and claims, the Battiston Molded Clog as designed by Ettore Battiston and manufactured by Reddyhoff since

at least 2000, with the "addition" of a strap.  However, such a strap had previously existed for

many years on a wide variety of footwear, including clogs and sandals, including the Calzuro

Molded Clog which predated the Battiston Molded Clog, let alone the Crocs' clog. Upon

information and belief, Seamans, Boedecker, Hanson, Reddyhoff and Crocs were aware that the

Calzuro Molded Clog (including a strap) was offered for sale, sold, or in public use in the United

States prior to February 7, 2006.

26.     Seamans claimed to have invented the entire shoe, including the base of the shoe

and its particular design and functional features, such as a substantially vertical toe region

containing ventilators extending up a majority of the height of the vertical portion, an insole

surface containing a raised pattern extending throughout the insole surface, a decorative pattern

of raised bumps, and a bottom surface of the shoe outsole having front and rear tread patterns,

among other claim elements.  Each and every functional feature disclosed in the patent

application, except the heel strap, already existed in the Battiston Molded Clog, which had been

designed, manufactured, and sold long prior to Seamans, Boedecker, Hanson and Crocs

"discovering" the shoe in 2001, including the Reddyhoff and FOAM's AquaClog. Straps have

existed for many years on a wide variety of footwear, including clogs and sandals. No later than

2001, Calzuro Molded Clogs featuring a pivoting strap were sold in the United States (upon

information and belief, Calzuro Molded Clogs had been available in the U.S. market since the

1980s). The pivoting straps on these Calzuro Molded Clogs were attached by a rivet, and these

Calzuro Molded Clogs featured a substantially vertical toe region containing ventilators

extending up a majority of the height of the vertical portion, an insole surface containing a raised

pattern extending throughout the insole surface, and a bottom surface of the shoe outsole having

separated front and rear tread patterns. Further, a single-piece, elastically molded deformable

plastic (i.e., rubber-like polymer) shoe featuring a pivoting strap, ventilated holes, and patterns of

raised bumps on the insole surface, (as embodied by the Calzuro Molded Clog) were disclosed

and described in Italian (utility) Patent 00245068 filed in June 1998, published on December 22,

1999, and granted in March 2002 ("the BIHOS Patent").   A copy of the BIHOS Patent, and a

certified English translation thereof, is attached hereto as Exhibit D and is incorporated by

reference herein.  Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff and

Crocs were also aware of the BIHOS Patent, which described and depicted the Calzuro Molded

Clog, prior to February 7, 2006.

27.     Upon information and belief, in July 2002, Seamans, Boedecker, Hanson and

Crocs had no shoe product, yet Reddyhoff and FOAM offered Seamans, Boedecker, Hanson and

Crocs the prospective right to distribute FOAM's then-existing Battiston Molded Clog with and

without a heel strap in the United States.  By August 2002, at the latest, the Battiston Molded

Clog, with and without a heel strap, was offered for sale and/or sold in the United States by

Reddyhoff and FOAM.  When Crocs' co-founder Seamans (and Crocs) subsequently filed patent

applications directed to this technology and design, Boedecker, Seamans, Hanson and Crocs

knew that Seamans had no right to claim inventorship, and particularly not sole inventorship.

Upon information and belief, Boedecker, Seamans, Hanson and Crocs also knew it had no right

to assert novelty and non-obviousness relating to these products or designs.  This is exemplified

by the fact that Boedecker, Seamans, Hanson and Crocs initially sold molded clogs bearing

Reddyhoff's Rebound brand name with a sticker added by Boedecker, Seamans, Hanson and

Crocs to include the Crocs logo on the clogs, and also by the fact that the designs for the

AquaClog had been published by April 2002.

28.     On March 28, 2006, the '789 patent, entitled "Footwear," with Crocs as the

assignee and Seamans as the sole listed inventor.  The '789 patent contains diagrams of the base

shoe that are substantially similar to the diagrams that were created by Ettore Battiston in 2000

and assigned from Battiston to Reddyhoff and FOAM with a strap added that serves a functional

purpose and such as had previously existed for many years on a wide variety of footwear,

including clogs and sandals such as the Calzuro Molded Clog, which was on sale and patented

by the BIHOS Patent.  The shoe depicted in the '789 patent is the Battiston Molded Clog and

was thus not new and inventive nor invented and designed by Seamans or by Crocs, or even by

Reddyhoff or FOAM.  Nevertheless, Seamans falsely claimed to be the sole inventor of the

design reflected in the '789 patent.

29.     Upon information and belief, at the time of the filing of the applications for the

'858 patent and the '789 patent, during the entire application process, at the time the patents were

issued, and at all times since, Crocs, its founders, including Seamans, Boedecker, Hanson its

senior officers, and its agents and representatives, working together with FOAM and its

founders, and its senior officers, including Reddyhoff, to achieve a common objective, made

fraudulent statements and fraudulently concealed material facts relating to the claims contained

in the patent applications, the true origin of the Battiston Molded Clog design, its true inventor

and the existence of prior public use and sales of goods disclosing the invention more than one

year prior to filing.  Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff and

Crocs acted at all times knowing that these patents were invalid and unenforceable.

**C.**   **Crocs Has Conceded that It Knows Seamans Cannot Properly Be the Sole Inventor of the '858 Patent and the '789 Patent**

30.      On or about January 28, 2005, Crocs initiated a lawsuit against Holey Soles

Holdings Ltd. in Canadian Federal Court by filing a Statement of Claim.  In its Statement of

Claim, Crocs alleged, among other things, that FOAM's footwear designs, including the BEACH

model sold by Crocs in the United States, were created by Mr. Ettore Battiston.

31.      Among other things, Crocs alleged the following in its Statement of Claim:

6.      Foam's Footwear bear one or more unique designs on the exterior of the shoe, the intended purpose of which is, and always has been to distinguish Foam's Footwear from shoes offered for sale by others.  Such unique designs comprise the following designs as indicated on the BEACH model of Foam's Footwear depicted below ("Foam's Designs"): . . .

7.      Foam's Designs were created solely by Mr. Ettore Battiston ("Battistion", in the course of his employment by L'Artigiani Stampi di Battistion Ettore e C. S.n.c. ("Stampi"), a small Italian company specializing in shoe designs.  At all material times, Battistion was a citizen of and ordinarily resident in Italy.  As Battistion's employer at all material times, Stampi was the first owner of the copyright in Foam's Designs, which were first published in April 2002.

8.      During a trip to Italy in 2000, Foam's president Mr. Andrew Reddyhoff first viewed a sample of the shoe depicted in Paragraph 6 above (minus the strap).  During such visit, Foam purchased from Stampi a sample mould that could be used to create a strapless version of what would become the BEACH model of Foam's Footwear, which Foam initially marketed under the trade mark AQUA CLOG ("Foam's Initial Shoe").  Shortly thereafter, Foam purchased a series of moulds that would make different sizes of Foam's Initial Shoe.

…

12.      Since July 2002, over 750,000 pairs of Foam's Footwear branded with the CROCS trade mark have been sold in the United States through a distributorship arrangement with Crocs LLP ("Crocs"), formerly Western Brands LLP.  Under such arrangement, Crocs is licensed by and with Foam's authority to

use Foam's Designs in association with the sale and promotion of Foam's Footwear.  Under such license, Foam has direct and indirect control of the character and quality of the products and services Crocs sells and provides in association with Foam's Designs.  Foam establishes the quality standards to be met by Crocs regarding the use of Foam's Designs, and Foam ensures such standards are in fact met.

13.    A strap was added to the BEACH model of Foam's Footwear offered for sale in the United States in 2002, and in Canada in 2004.

32.    Based solely on Crocs' allegations in the Canadian lawsuit against Holey Soles Holdings Ltd., Seamans, Boedecker, Hanson, Reddyhoff, Snyder, Smach, Croghan, Marks, McCarvel, Rebich, Hoverstock and Crocs knew or should have known that Seamans was not, and could not have been, the sole inventor of the '858 patent and the '789 patent.  Further, Hart, Smach, Rees, Rebatt, Frasch, Melwani, and Hoverstock are presently aware based on Crocs' allegations in the Canadian lawsuit against Holey Soles Holdings Ltd., that Seamans was not, and could not have been, the sole inventor of the '858 patent and the '789 patent.  On or about March 10, 2005, Holey Soles Holdings Ltd. filed a Statement of Defence in the Canadian lawsuit.  A copy of the Statement of Defence is attached hereto as Exhibit P, and is incorporated by reference herein.  Among other things, the Statement of Defence identifies several shoes that were sold prior to Crocs' Beach model, and lists those items in a Schedule A.  Among others, Schedule A includes an entry listing "Bihos s.r.l" as a "Party," "Calzuro" as a "Trademark," and http://www.calzuro.it/ and "http://www.allheart.com/plogsclogs.html" both as an "Example of Reference to Product(s)."

33.    Upon information and belief, the attorneys prosecuting the '858 patent and the '789 patent for Crocs received a copy of the January 28, 2005 Statement of Claim filed by Crocs and of the March 10, 2005 Statement of Defence filed by Holey Soles Holdings Ltd.  Based

solely on Crocs' allegations in the Canadian lawsuit against Holey Soles Holdings Ltd., the attorneys prosecuting the '858 patent and the '789 patent for Crocs knew or should have known that Seamans was not, and could not have been, the sole inventor of the '858 patent and the '789 patent.  Further, based on the Statement of Defence filed by Holey Soles Holdings Ltd., the attorneys prosecuting the '858 patent and the '789 patent for Crocs knew or should have known of the prior art Calzuro Molded Clog with a strap, and that it was material to at least the then-pending '858 patent.

**D.     Crocs' Failed Attempts to Obtain Patents in Foreign Countries**

34.     Crocs has been unable to secure patents similar to the '858 patent or the '789 patent in many nations outside the U.S., primarily because of the well-known existence of prior sales, the widely-recognized existence of invalidating prior art, and the established identity of the true and proper inventorship and origin of the shoe.

35.     For example, Crocs unsuccessfully sought to obtain the same claims in Canada that issued in the U.S. as the '858 patent.  Crocs filed an application for patent in Canada on December 24, 2004.  The application claimed priority to the then-pending application which eventually issued as the '858 patent, and was assigned application number CA 2 491 269.  The application was entitled "Footwear Pieces and Methods for Manufacturing Such."  Seamans was the sole listed inventor.  As amended on June 19, 2006, two of the claims which Crocs sought to patent were identical to issued claims 1 and 2 of the '858 patent.

36.     On July 12, 2006, the law firm of Oyen Wiggs Green & Mutala LLP submitted a letter to the Canadian Intellectual Property Office containing information for consideration by the Examiner.  The letter, in its first paragraph asserted that all of the pending claims of the

Canadian patent application were "clearly anticipated by and are also obvious in light of" the

BIHOS Patent. The letter also enclosed a translation of the BIHOS Patent as well as a claim chart

"setting out the manner in which [the BIHOS Patent] anticipates each of claims 1-29." On July

28, 2006, the Canadian Intellectual Property Office mailed a notice advising Crocs' attorneys

that "prior art has been filed under Section 34.1 of the Patent Act, by Oyen Wiggs Green &

Mutala LLP of Vancouver against the above mentioned application" which enclosed a copy of

the July 12, 2006 letter. Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff,

Croghan, Hoverstock, Marks, McCarvel, Rebich, Smach, Snyder and Crocs knew or should have

known about the July 12, 2006 letter from Oyen Wiggs Green & Mutala LLP shortly after July

28, 2006, at the latest.

    37.    Crocs thereafter chose to abandon the Canadian patent application, which negated

the possibility that it would have to address any rejection based on the BIHOS Patent. On July

28, 2008, the Canadian Intellectual Property Office updated the status of application CA 2 491

269 to reflect that it was a "Dead Application."

    38.    As another example, Crocs unsuccessfully attempted to obtain a patent for the

same molded clog in Australia. On December 30, 2004, Crocs filed a request for an examination

with IP Australia, the Australian intellectual property office. The application, which claimed

priority to the then-pending U.S. patent application which eventually issued as the '858 patent,

was assigned application number 2004243118.

    39.    The application was entitled "Footwear Pieces and Methods for Manufacturing

Such." Seamans was the sole listed inventor. As amended on April 26, 2006, two of the claims

which Crocs sought to patent were identical to issued claims 1 and 2 of the '858 patent.

40.     On August 23, 2006, the law firm of Davies Collison Cave submitted a letter to the Australian Commissioner of Patents containing information for consideration by the Examiner.  The letter, in its first paragraph, asserted that all of the pending claims of the Australian patent application were "not novel and do not involve an inventive step in light of" the BIHOS Patent.  The letter also enclosed a translation of the BIHOS Patent as well as a claim chart "setting out the manner in which [the BIHOS Patent] anticipates each of claims 1-31."  On September 5, 2006, the Australian intellectual property office mailed a notice advising Crocs' attorneys that "prior art has been filed under Section 27(1) of the Patents Act 1990" which enclosed a copy of the August 23, 2006 letter and the attachments thereto.  Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff, Croghan, Hoverstock, Marks, McCarvel, Rebich, Smach, Snyder and Crocs knew or should have known about the August 23, 2006 letter from Davies Collison Cave, the BIHOS Patent, and the claim chart prepared by Davies Collison Cave shortly after September 5, 2006, at the latest.

41.     On September 22, 2006, Alison McMillan, a registered patent attorney submitted a "Notice of Matters affecting validity of a Standard Patent" to the Australian Commissioner of Patents containing information for consideration by the Examiner.  The notice asserted that the claims in Australian Patent Application 2004243118 are "not a patentable invention."  The letter also enclosed a copy of the BIHOS Patent and an English translation of the BIHOS Patent.  On September 29, 2006, the Australian intellectual property office mailed a notice advising Crocs' attorneys that "prior art has been filed under Section 27(1) of the Patents Act 1990" which enclosed a copy of the September 22, 2006 letter and the attachments thereto.  Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff, Croghan, Hoverstock, Marks, McCarvel,

Rebich, Smach, Snyder and Crocs knew or should have known about the September 22, 2006 letter from Ms. McMillan and the BIHOS Patent shortly after September 22, 2006, at the latest.

42.    Crocs thereafter chose to abandon the Australian patent application, which negated the possibility that it would have to address any rejection based on the BIHOS Patent. On February 5, 2007, the Australian intellectual property office mailed a notice to Crocs informing Crocs that Australian application 2004243118 had lapsed because it failed to gain acceptance within the prescribed time.

43.    As another example, Crocs unsuccessfully attempted to patent the same footwear in Europe.  On June 15, 2005, Crocs filed a request for examination with the European Patent Office.  The application, which claimed priority to May 23, 2003, was assigned application number 04752286.7 and published with publication number EP1538937.  Crocs entitled the application "Footwear Pieces and Methods for Manufacturing Such."  Seamans was the sole listed inventor.

44.    In the European patent application, Crocs unsuccessfully sought to patent the same footwear that is claimed in the '858 patent.  For example, claim 1 in the application recited:

1.    A footwear piece (100) comprising:

a base section (110) comprising an upper (150) and a sole (162), the base section (110) comprising a first side and a second side; and

a strap section (120) comprising a first end (130) and a second end (130), the first end (130) attached to the base section (110) on the first side by a first rivet (131), the second end (130) attached to the base section (110) on the second side by a second rivet (131), the strap section (120) contacting the base section (110) at the first end (130) and at the second end (130) such that the strap section (120) pivots relative to the base section (110);

characterized in that:

the upper (150) and the sole (162) are molded of a first continuous piece of foam material; the strap section (120) is molded of a second continuous piece of foam material; and

a frictional force between the strap section (120) and the base section (110) substantially maintains the strap section (120) in a selected position relative to the base section (110).

45.     On September 13, 2006, the law firm of Eisenführ, Speiser & Partner filed an "Observation by third party in accordance with Article 115 EPC."  The Observation enclosed the BIHOS Patent and pointed out that the pending claims were both "anticipated by and are also obvious in light of [the BIHOS Patent.]"  The Observation also included a claim chart "setting out the manner in which [the BIHOS Patent] anticipates each of the claims."  The Observation and the BIHOS Patent were placed in the file for EP1538937.  On September 25, 2006, the European Patent Office mailed a copy of the third party observation to Crocs' counsel.  Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff, Croghan, Hoverstock, Marks, McCarvel, Rebich, Smach, Snyder and Crocs knew or should have known about the Observation and the BIHOS Patent shortly after September 25, 2006, at the latest.

46.     On February 21, 2007, the law firm of Reichel und Reichel filed an "Observation of Third Party Filed Under Art. 115 EPC."  This Observation enclosed the BIHOS Patent and pointed out that EP1538937 was "not new and inventive" in view of the BIHOS Patent.  The Observation and the BIHOS Patent were placed in the file for EP1538937.  On March 5, 2007, the European Patent Office mailed a copy of the third party observation to Crocs' counsel.  Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff, Croghan, Frasch, Hoverstock, Marks, McCarvel, Rebich, Smach, Snyder and Crocs knew or should have known about the Observation and the BIHOS Patent shortly after March 5, 2007, at the latest.

47.     Crocs thereafter chose to abandon the European patent application, which negated the possibility that it would have to address any rejection based on the BIHOS Patent.  On August 17, 2007, the European Patent Office updated the status of EP1538937 to reflect that the application was "deemed to be withdrawn."

48.     As a further example, on November 22, 2004, Crocs filed a Community Design application with the European Union Office for Harmonization in the Internal Market.  The Community Design, assigned number 000257001-0001, claimed priority to the application which issued in the U.S. as the '789 patent, and included the same figures that are claimed as the design in the '789 patent.  After Crocs appealed an initial rejection of the Community Design as not properly patentable, the Third Board of Appeal issued its decision on March 26, 2010. A copy of the Decision of the Third Board of Appeal of 26 March 2012, is attached hereto as Exhibit Q and is incorporated by reference herein.

49.     Among other things, Crocs' Community Design had been challenged for lacking individual character because the AquaClog was prior art to the design, was identical to the design Crocs sought to patent except for the heel strap of the Crocs design, and produced the same overall impression as the Crocs design.  According to the Third Board of Appeal, "the presence/absence of the heel strap does not alter the overall impression made on the informed user – a reasonably informed buyer and wearer of leisure footwear such as clogs – by the two designs, which remains the same."  The Board further opined that "[T]he heel strap is a feature that [Crocs] added to the earlier version of the clog.  Even though the strap has thus become an element of the design of the clog, it is a relatively marginal one, in the sense that the clog – with or without the strap – produces on the informed user the same overall impression."  The Board

further clarified that the purpose of the heel strap was functional, i.e., to keep the foot firmly

inside the clog.  In conclusion, the Board declared Crocs' Community Design to be invalid "for a

lack of novelty and lack of individual character." Upon information and belief, Seamans,

Boedecker, Hanson, Reddyhoff, Croghan, Frasch, Hoverstock, Hart, Lasher, McCarvel, Smach

and Crocs knew or should have known about the Third Board of Appeal issued its decision on

March 26, 2010, at the latest.

### E.  Crocs' Sham Lawsuit Campaign

50.     On March 31, 2006, three days after the '789 patent issued, Crocs filed a

Complaint with the International Trade Commission ("ITC") against Double Diamond and other

respondents, alleging infringement and seeking a General Exclusion Order banning the

importation and sale of molded clog products based on patents that, upon information and belief,

Crocs clearly knew to be invalid and/or unenforceable. Upon information and belief, the decision

to file a Complaint with the ITC was made, ratified, or acquiesced to, by Seamans, Boedecker,

Hanson, Reddyhoff, Croghan, Frasch, Hoverstock, Hart, Lasher, McCarvel, Smach and Crocs

with the knowledge that this act was unlawful at the time.

51.     On April 3, 2006, six days after the '789 patent issued, Crocs filed a lawsuit (the

"2006 Lawsuit") against a number of entities alleging infringement of patents even as Crocs,

upon information and belief, clearly knew the patents identified incorrect inventorship and had

been obtained by withholding material information from the patent examiner.  Double Diamond

was among the original named defendants in the 2006 Lawsuit. Upon information and belief, the

decision to file the 2006 Lawsuit was made, ratified, or acquiesced to, by Seamans, Boedecker,

Hanson, Reddyhoff, Croghan, Frasch, Hoverstock, Hart, Lasher, McCarvel, Smach and Crocs with the knowledge that this act was unlawful at the time.

52.     On April 11, 2008, the presiding Administrative Law Judge ("ALJ") in the ITC proceeding issued a final initial determination finding no violation of section 337 by Double Diamond.  In particular, Double Diamond was found not to have infringed the '789 patent, and the '858 patent was found to be invalid as obvious under 35 U.S.C. §103 in light of the combination of (1) Crocs' own AquaClog (the base clog section of claims 1 and 2 of the '858 Patent); and (2) U.S. Patent No. 6,237,249 (the "Aguerre '249 patent"). The ALJ's determination made no finding on whether either asserted patent was unenforceable due to inequitable conduct.

53.     On July 25, 2008, the ITC affirmed the determination of the ALJ and terminated the investigation, finding no violation of section 337.  The ITC confirmed that the '789 patent was not infringed by Double Diamond and that the '858 patent was invalid.  The ITC took no position regarding the issue of whether the '789 patent or the '858 patent were unenforceable. Crocs appealed the determinations that the '789 patent was not infringed and that the '858 patent was invalid (based only on the specific combination of the Crocs' Aqua Clog and the Aguerre '249 patent).  Upon information and belief, the decision to appeal was made, ratified, or acquiesced to, by Seamans, Boedecker, Hanson, Reddyhoff, Croghan, Frasch, Hoverstock, Hart, Lasher, McCarvel, Smach and Crocs with the knowledge that this act was unlawful at the time.

54.     On February 24, 2010, the U.S. Court of Appeals for the Federal Circuit issued a limited-scope decision reversing the determination that the '858 patent was obvious in view of the combination of the AquaClog and the Aguerre '249 patent.  Notably, the Federal Circuit ruling did not reach any other grounds of invalidity.  For example, the Federal Circuit did not

consider Crocs' own prior sales of the molded Beach shoe, nor did it consider the Calzuro

Molded Clog with a strap or the BIHOS Patent.  Further, issues of Crocs' inequitable conduct

were not before the Federal Circuit as part of the appeal.  The Federal Circuit remanded the

proceeding back to the ITC for further proceedings.

55.     On February 9, 2011, on remand from the Federal Circuit, the presiding ALJ

issued an initial determination that the respondents failed to establish that the asserted patents

were unenforceable. The ALJ made no determination as to the validity of the '789 patent or the

'858 patent.

56.     On April 25, 2011, the ITC issued notice of its determination to affirm the ALJ's

ruling. The ITC also took no position regarding the issue of validity of the '858 patent or the

'789 patent.

57.     Upon information and belief, Seamans, Boedecker, Hanson, Reddyhoff, Croghan,

Frasch, Hoverstock, Hart, Lasher, McCarvel, Smach and Crocs acted at all times in the ITC

proceeding, including in front of the ALJ, the ITC, and the Federal Circuit, knowing that these

patents were invalid and unenforceable and therefore their actions were unlawful.  For example,

had Crocs disclosed to the ITC that Seamans was not the correct inventor of the '789 patent or

the '858 patent, Crocs' request for an exclusion order would have been denied.

58.     On August 6, 2012, Crocs filed its First Amended Complaint in the 2006 Lawsuit,

adding USA Dawgs as a named defendant, and alleging that USA Dawgs infringed the '858

patent and the '789 patent.  In its First Amended Complaint in the 2006 Lawsuit, Crocs failed to

identify any USA Dawgs product that was allegedly infringing.  In view of this failure, and the

fact that both patents are invalid at least for the fact that they name incorrect inventorship, and

unenforceable at least in connection with the false declarations by Seamans claiming sole inventorship, this litigation is objectively baseless.  In addition, Crocs had, by the time it filed the First Amended Complaint in the 2006 Lawsuit and sued USA Dawgs, been made aware of the BIHOS patent, which Crocs knew or should have known rendered the claims of at least the '858 patent to be invalid.  Due to the initiation of this objectively baseless litigation, USA Dawgs was forced to curtail its business activities and sustained significant pecuniary injury as a result. Upon information and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, Smach and Crocs, participated in the decision to file a First Amended Complaint naming USA Dawgs as a Defendant, or ratified or acquiesced in the decision to do so with the knowledge at the time that their actions were unlawful.

59.    Because of Crocs' enforcement of the '858 patent and the '789 patent, and other litigation pursued by Crocs against its competitors, many of the molded clog-type footwear competitors have ceased conducting business in the United States.  Upon information and belief, Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Marks, Margolis, McCarvel, Rebich, Seamans, Smach, Snyder and Crocs purposely initiated, maintained, and made known such lawsuits with the goal of causing its smaller competitors to endure the inordinate cost of defending themselves both in legal venues and in the court of public opinion, in this instance, their then-actual or potential customers.  For example, Crocs has brought patent infringement lawsuits in the United States against at least Collective Licensing International, Effervescent, Inc., Gen-X Sports, Inc., Holey Soles Holding Ltd, Australia Unlimited, Inc., Cheng's Enterprises, Inc., Inter-Pacific Trading Corp, Pali Hawaii of Honolulu, Shaka Shoes, Old Dominion Footwear, Inc., Dream Products, Inc. and The Children's Place, Inc.  Upon

information and belief, due to the lawsuits pursued by Crocs, several of these entities have

ceased operations altogether.

**F.**     **USA Dawgs' Patent Reexamination Proceedings**

60.     On August 3, 2012, Double Diamond filed an application for *inter partes*

reexamination against the '858 patent with the U.S. Patent Office.

61.     On August 8, 2012, only five days later, Crocs initiated another separate bad faith

and baseless lawsuit against CVS Pharmacy, a known retailer of DOGGERS brand molded clogs

made by USA Dawgs (the "CVS Lawsuit").  The CVS Lawsuit was predatory, retaliatory, and

filed in bad faith, as it clearly lacked any legitimate basis, is apparently duplicative, and was filed

solely for the purpose of encumbering and distracting USA Dawgs, intentionally interfering with

its business relationship with CVS, and causing it to incur additional expense in continuing

complex litigation.  Crocs had no basis to assert personal jurisdiction against CVS when the suit

was first filed.  Nevertheless, Crocs refused to voluntarily dismiss its lawsuit against CVS.  CVS

was therefore forced to expend resources filing two motions to dismiss based on personal

jurisdiction.  Despite its refusal to dismiss its lawsuit against CVS for more than four years,

Crocs never articulated any basis for personal jurisdiction against CVS.  It never responded to

the motions to dismiss.  Finally, as Crocs' deadline to respond to CVS' second motion to dismiss

was impending, Crocs voluntarily dismissed its complaint and filed yet another lawsuit against

CVS in the Southern District of Florida on June 10, 2016 ("the Florida CVS lawsuit").  The

Florida CVS lawsuit is equally baseless.  Crocs has asserted the '789 patent against CVS in the

Florida CVS lawsuit.  However, the '789 patent has now been twice rejected by the Patent Office

as unpatentable, and Crocs has no non-frivolous basis for arguing that the Patent Office

incorrectly issued the rejections.  In fact, Crocs is depending on a false declaration from Seamans to convince the Patent Office to withdraw its rejections.  The Florida CVS lawsuit is exemplary of the conduct of Crocs and the Conspirator Defendants to affect Crocs' potential competitors with baseless legal action.  In particular, Crocs, at the behest and/or approval of the Conspirator Defendants, purposely increased CVS' expenses by forcing it to file two motions to dismiss when Crocs never had any basis to oppose the motion.

62.     Upon information and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, Smach and Crocs knew that CVS was one of USA Dawgs' largest customers and that this filing would have a major impact on USA Dawgs' continuing business dealings with CVS. This retaliatory filing is a clear example of Crocs improperly using the power of the judicial system to interfere with the business of Double Diamond and USA Dawgs and to manipulate and control the relevant market.  Indeed, USA Dawgs' sales to CVS were greatly reduced because of the CVS Lawsuit. Upon information and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, Smach and Crocs, participated in the decision to file the CVS Lawsuit, or ratified or acquiesced in the decision to do so with the knowledge at the time that their actions were unlawful.

63.     On August 24, 2012, USA Dawgs filed an application for *inter partes* reexamination with the U.S. Patent Office against the '789 patent with the U.S. Patent Office. That reexamination was assigned Control No. 95/002,100 by the U.S. Patent Office.

64.     On April 29, 2013, the U.S. Patent Office issued a non-final Office Action rejecting the single claim of the '789 patent as unpatentable under 35 U.S.C. § 102(b).  The Office Action stated that the design of the '789 patent was disclosed and was published on

Crocs' own website more than one year prior to the application for a patent in the United States and serves as an absolute, statutory bar on Crocs obtaining a patent on the subject matter of this continuation-in-part application. Despite this rejection, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, Smach and Crocs did not and have not stopped prosecuting its litigation against Plaintiffs.  Crocs' baseless, bad-faith patent litigation is clearly predatory and a sham, and has caused and continues to cause on-going damage to USA Dawgs and Double Diamond.

65.     On July 29, 2013, Crocs filed a response to the April 29, 2013 Office Action, in which Crocs asserted that the '789 patent was properly patentable and that the U.S. Patent Office should withdraw the rejection of the patent.  In support, Crocs filed a declaration from Seamans. In the declaration, Seamans stated that he is "the sole inventor of the U.S. Design Patent No. D517,789" and that "the drawings of the '416 Application [Application No. US 10/602,416] and '126 Application [Application No. US Application No. 10/603,126] were renderings of a strapped shoe that [Seamans] designed."  These statements as to Seamans' inventorship were and are false. Upon information and belief Seamans, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, and Smach participated in the decision to file a false declaration, or ratified or acquiesced in the decision, with the knowledge that their actions were unlawful.

66.     On February 11, 2016, the U.S. Patent Office issued an Action Closing Prosecution of the '789 patent, once again rejecting the sole claim of the '789 patent as unpatentable and closing the reexamination prosecution related to that patent. The Action Closing Prosecution is attached hereto as Exhibit E, and is incorporated by reference herein. Despite the fact that it submitted false declarations to the U.S. Patent Office previously, Crocs argued in a March 11, 2016 response to the U.S. Patent Office that the claim in the '789 patent

was patentable, and that the Examiner should withdraw the rejection of the claim. Neither Crocs,

Seamans, nor Crocs' attorneys prosecuting the reexamination of the '789 patent have taken any

steps to withdraw the false Seamans declaration or to otherwise inform the U.S. Patent Office

that the declaration is false.

67.     Despite its repeated false statements, withholding of information, its other

nefarious activities, and now, the U.S. Patent Office's second rejection of the '789 patent as

unpatentable, Crocs has not dismissed or amended its claims against Double Diamond, USA

Dawgs, or CVS.  Nor has Crocs taken any action to alter the Exclusion Order entered by the ITC

that Crocs continues to benefit from. Upon information and belief Croghan, Frasch, Hart,

Hoverstock, Rees, Ribatt, and Smach each have participated in the decision not to dismiss or

amended its claims against Double Diamond, USA Dawgs, or CVS, or take any action to alter

the Exclusion Order.

**G.     Crocs' Success**

68.     Crocs boasts that it is the "world leader in innovative and casual footwear"

products.  Crocs claims that it offers several "distinct" shoe collections, including its clog shoes

featuring Croslite foam material. Crocs further claims that since its inception in 2002, it has sold

more than 300 million pairs of shoes and reached $1 billion in annual sales in 2011. Crocs is

reported to have reached a market value of $6 billion in 2007.  According to Crocs, in 2008 its

market share for "comfort sandals" was 76%.  Upon information and belief, Crocs' market share

in the molded clog-type footwear product market in the United States exceeds 90%.

**H.**     **Crocs' Conduct Has Negatively Impacted Double Diamond and USA Dawgs**

69.     Shortly after Crocs started its aggressive sham patent infringement litigation campaign in 2006 to intimidate its competitors into ceasing their businesses, sales of Crocs' molded clog footwear accelerated. Indeed, contemporaneously with the granting of the '858 patent and the '789 patent that were obtained and continue to be maintained by fraud, and the initiation of a broad-based patent misuse litigation offensive against known competitors, reaching far beyond the narrow scope of any intellectual property rights that Crocs might purportedly possess (even if valid), Crocs sales roughly tripled from 2006 to 2007 and exploded from $100 million per year in 2006 to over $1 billion by 2011.

70.     The ITC General Exclusion Order obtained by Crocs, based on the '858 patent and the '789 patent, has operated as a bar against the importation of molded clog-type products by Double Diamond, USA Dawgs, and all other competitors.  This has caused hardship to Double Diamond and USA Dawgs even beyond preventing the importation of strapped clog-type footwear products Crocs accused of infringement in the ITC Investigation.  For example, the U.S. Customs has stopped and held Plaintiffs' shipments of strapless clog-type footwear – which Crocs has never accused of infringing the patents which are the subject of the Exclusion Order – into the U.S. based on the ITC General Exclusion Order.  This has negatively affected the relationships between USA Dawgs and its largest customers, and is particularly egregious as not only should the ITC General Exclusion Order never have issued in the first place, but it is being applied far beyond its intended scope, to the detriment to Plaintiffs.  Crocs continues to enjoy protection from the ITC even though Crocs, its officers, directors, agents, representatives and attorneys have been made aware of the materiality of the BIHOS Patent, the incorrect

inventorship listed on both the '858 patent and the '789 patent, the false declarations submitted

during the prosecution of the '858 patent and the '789 patent and during the reexamination of the

'789 patent, and the U.S. Patent Office's rejection of the '789 patent as unpatentable.

71.     Due to the knowingly unlawful actions of Boedecker, Hanson, Croghan, Frasch,

Hart, Hoverstock, Lasher, Lococo, Marks, Margolis, Melwani, McCarvel, Rebich, Reddyhoff,

Rees, Ribatt, Smach, Snyder and Crocs' actions in obtaining and maintaining the '858 patent and

the '789 patent under false pretenses and Crocs' past and ongoing misuse of those patents,

Double Diamond and USA Dawgs have incorrectly become widely deemed and stigmatized as

counterfeiters and providers of merely knock-off footwear.  Today, on the popular website

Wikipedia, "USA DAWGS/Doggers" is listed under the heading "Imitations and Counterfeits"

on the Crocs Wikipedia page entry, as though every boot, shoe and flip-flop that Double

Diamond and USA Dawgs have, do, or could make necessarily infringes Crocs' narrow, invalid,

and fraudulently obtained patents.  A copy of the Crocs Wikipedia entry is attached hereto as

Exhibit R and is incorporated by reference herein. As it pertains to Crocs' Wikipedia page,

Croghan, Frasch, Hart, Hoverstock, Melwani, Rees, Ribatt, Smach, and Crocs have caused such

statements to be published either by submitting them for publication or, upon information and

belief, failing to take any steps to have them removed.

72.     By reason of Crocs' unlawful and anticompetitive conduct, Plaintiffs' brands and

reputation have been significantly tarnished.  Consequently, both Double Diamond and USA

Dawgs have been unable to sell to many major retailers and distributors. Upon information and

belief, Crocs has deliberately increased the hardship it has caused to Plaintiffs even beyond the

sham lawsuits as it has forced retailers that carry Crocs products to agree to not sell or display

any product that is similar to any Crocs product.  Upon information and belief, Crocs has forced retailers to comply with this demand by threatening litigation or the cancellation of the retailer's Crocs retail reseller agreement.

73.    As a result of the damage Crocs has caused to Plaintiffs, both Double Diamond and USA Dawgs have been forced to concentrate even their non-accused products in mass market retail and flash and deal e-commerce channels with significantly reduced profit margins. Even these efforts have been thwarted by Crocs as Crocs sued USA Dawgs' largest customer, CVS, which caused CVS to dramatically decrease its business with USA Dawgs (and has made other retailers wary of doing business with Plaintiffs, for fear of Crocs' retaliatory conduct).

74.    Upon information and belief, Crocs has made it crystal clear to other retailers that their relationship with Crocs would be adversely affected – if not entirely terminated – if they did business with Double Diamond or USA Dawgs.  Additionally, the specter of small family-owned companies with multiple pending intellectual property litigation proceedings initiated by a billion-dollar competitor has and continues to prevent  Plaintiffs from accessing capital and reasonable financing to promote and grow their business.  This has, in turn, created hardship for Plaintiffs USA Dawgs and Double Diamond, and their owners.

75.    [this paragraph omitted intentionally]

76.    Crocs alleges that Plaintiffs infringe the '858 patent.

77.    USA Dawgs and Double Diamond have not infringed and do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '858 patent.

78.    [this paragraph omitted intentionally]

79.    [this paragraph omitted intentionally]

80.     Crocs alleges that Plaintiffs infringe the '789 patent.

81.     USA Dawgs and Double Diamond have not infringed and do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '789 patent.

82.     [this paragraph omitted intentionally]

83.     [this paragraph omitted intentionally]

84.     The '858 patent is invalid under one or more of the provisions in Title 35 of the United States Code, including §§ 101, 102, 103, 112, 256, and/or 305, and/or the rules, regulations and laws pertaining thereto.

85.     Even to the extent that the '858 patent claims are considered to be novel and non-obvious, which they are not, the '858 patent is invalid at least because it lists incorrect inventorship.

86.     [this paragraph omitted intentionally]

87.     [this paragraph omitted intentionally]

88.     The '789 patent is invalid under one or more of the provisions in Title 35 of the United States Code, including §§ 101, 102, 103, 112, 256, and/or 305, and/or the rules, regulations and laws pertaining thereto.

89.     Even to the extent that the design claimed by the '789 patent is considered to be novel and non-obvious, which it is not, the '789 patent is invalid at least because it lists incorrect inventorship.

90.     The '789 patent currently stands rejected by the U.S. Patent office.  On February 11, 2016, the U.S. Patent Office issued an Action Closing Prosecution of the '789 patent rejecting, for the second time, the single claim of the '789 patent as unpatentable.

91.      Crocs has not amended or withdrawn its claims against USA Dawgs, Double Diamond, or CVS related to alleged infringement of the '789 patent.  To the contrary, Crocs most recently sued CVS alleging infringement of the '789 patent on June 10, 2016.

92.      [this paragraph omitted intentionally]

**I.      False Seamans Declaration During Prosecution of '858 Patent**

93.      Crocs filed U.S. Application No. 10/603,126 ("the '126 application") on June 23, 2003.

94.      As filed, the '126 application included 20 claims, of which claims 1, 11, and 16 were the only independent claims.

95.      Claim 1, as filed with the '126 application, recited:

A breathable footwear piece, the breathable footwear piece comprising:

a base section, wherein the base section includes an upper and a sole; and

wherein the upper includes a substantially horizontal portion and a substantially vertical portion, and wherein the substantially horizontal portion is a solid portion, and wherein a plurality of ventilators are formed in the substantially vertical portion.

96.      Upon information and belief, claim 1 was directed to, intended to cover, and does in fact cover, the Battiston Molded Clog.

97.      Seamans was not the inventor of the subject matter claimed in claim 1 of the '126 application.

98.      Claim 11, as filed with the '126 application, recited:

A breathable workshoe, the breathable workshoe comprising:

an upper;

a sole; and

wherein the upper includes at least one ventilator surrounded by a liquid conductor.

99.     Upon information and belief, claim 11 was directed to, intended to cover, and

does in fact cover, a design for a work-shoe created by Ettore Battiston.

100.    Seamans was not the inventor of the subject matter claimed in claim 11 of the

'126 application.

101.    Claim 16, as filed with the '126 application, recited:

A method for manufacturing a breathable workshoe, the method comprising:

providing a mold, wherein the mold provides an outline of an upper and a sole, and wherein the upper includes the upper includes a substantially horizontal portion and a substantially vertical portion, and wherein the substantially horizontal portion is a solid portion, and wherein a plurality of ventilators are formed in the substantially vertical portion;

screwing a volume of resin into the mold, wherein the resin sets in the form of a footwear piece;

opening the mold; and

removing the footwear piece.

102.    Upon information and belief, claim 16 was directed to, intended to cover, and

does in fact cover, a method for manufacturing a work-shoe created by Ettore Battiston.

103.    Seamans was not the inventor of the subject matter claimed in claim 16 of the

'126 application.

104.    Upon information and belief, at the time the '126 application was filed, Seamans

was aware of the Battiston Molded Clog, and that Ettore Battiston conceived of the Battiston

Molded Clog.

105.   Upon information and belief, at the time the '126 application was filed, Boedecker, Hanson, Reddyhoff, FOAM and Crocs were aware of the Battiston Molded Clog, and that Ettore Battiston conceived of the Battiston Molded Clog.

106.   Upon information and belief, at the time the '126 application was filed, Seamans was aware of the work-shoe conceived by Ettore Battiston.

107.   Upon information and belief, at the time the '126 application was filed, Boedecker, Hanson, Reddyhoff, FOAM and Crocs were aware of the work-shoe conceived by Ettore Battiston.

108.   The '126 application, as filed on June 23, 2003, included a declaration under 37 C.F.R. § 1.63.  Upon information and belief, the declaration was signed by Seamans on June 18, 2003.

109.   Among other things, the declaration stated:

I/we believe that I/we am/are the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought;

I/we have reviewed and understand the contents of the above-identified application, including the claims, as amended by any amendment specifically referred to above;

I/we acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me/us to be material to patentability as defined in 37 CFR 1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT International filing date of the continuation-in-part application.

All statements made herein of my/our own knowledge are true, all statements made herein on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and may jeopardize the validity of the application or any patent issuing thereon.

110.   Because Seamans was not "the original and first inventor of the subject matter which is claimed" in claims 1, claim 11, and/or claim 16 of the '126 application, the declaration of Seamans was false.

111.   In addition to the concerns raised with submitting a false statement under oath, the misrepresentation of inventorship contained in the Seamans declaration was material to the patentability of the '126 application because inventorship is a critical requirement for obtaining a patent.

112.   Upon information and belief, Crocs' co-founders Seamans, Boedecker, Hanson and Crocs, and the prosecuting attorneys, each had, or should have had, personal knowledge of the falsity of the Seamans declaration submitted to the U.S. Patent Office on June 23, 2003.  In particular, both Seamans and Crocs knew that Seamans did not invent, let alone solely invent, the Battiston Molded Clog or the Battiston work-shoe.

113.   Seamans, Crocs, and the attorneys prosecuting the '126 application all owed a duty of candor to disclose material information to the U.S. Patent Office during the pendency of the prosecution of the '126 application, up to at least February 7, 2006 when the patent issued. Upon information and belief, Seamans, Crocs, and the attorneys prosecuting the '126 application intended to deceive the U.S. Patent Office by knowingly causing the false Seamans declaration to be submitted in connection with the '126 application and then failing to correct it for the nearly three year pendency of the prosecution.  Upon information and belief, Seamans and Crocs hoped to shield the U.S. Patent Office from the falsity of the declaration in an effort to ensure that the '126 application would be granted as the '858 patent and to further ensure that Seamans

would be the sole inventor listed on the face of that patent such that the patent rights would be owned solely by Crocs.

114.   At no time during the prosecution of the '126 application did Seamans, Boedecker, Hanson, Croghan, Hoverstock, Marks, McCarvel, Rebich, Reddyhoff, Smach, Snyder, FOAM, Crocs, or anyone else associated with the prosecution of the application inform the U.S. Patent Office that the Seamans declaration was false.

115.   As issued, the '858 patent includes two claims, both of which are independent claims.

116.   Both claim 1 and claim 2 of the '858 patent, as issued, are directed to, intended to cover, and do in fact cover the Battiston Molded Clog with the addition of a pivoting heel strap.

117.   Because Seamans did not invent the Battiston Molded Clog, the Seamans declaration, which claims that Seamans is the sole inventor of the '126 application and the '858 patent, was false during the entire pendency of the prosecution of the '858 patent.

118.   In addition to the concerns raised with failing to disclose to the U.S. Patent Office that a false statement under oath had previously been submitted, the continued misrepresentation of inventorship contained in the Seamans declaration was material to the patentability of the '126 application because inventorship is a critical requirement for obtaining a patent.  Had Seamans, Crocs, or any of the prosecuting attorneys disclosed to the U.S. Patent Office that the Seamans declaration was false, the U.S. Patent Office would have rejected the '126 application at least until such time as the false oath was withdrawn and the inventorship corrected.

119.   Upon information and belief, Seamans, Boedecker, Hanson, Croghan, Hoverstock, Marks, McCarvel, Rebich, Reddyhoff, Smach, Snyder, Crocs, and the prosecuting

attorneys, each had, or should have had, personal knowledge of the falsity of the Seamans declaration submitted to the U.S. Patent Office at all times during the prosecution of the '126 application.  In particular, both Seamans and Crocs knew that Seamans did not invent, let alone solely invent, the Battiston Molded Clog that was claimed in both the '126 application as filed, and in both claims of the '858 patent, as issued.

120.     Seamans, Crocs, and the attorneys prosecuting the '126 application all owed a duty of candor to disclose material information to the U.S. Patent Office during the pendency of the prosecution of the '126 application, up to at least February 7, 2006 when the patent issued. Upon information and belief, Seamans, Crocs, and the attorneys prosecuting the '126 application intended to deceive the U.S. Patent Office by knowingly causing the false Seamans declaration to be submitted in connection with the '126 application and then failing to correct it for the nearly three year pendency of the prosecution.  Upon information and belief, Seamans and Crocs hoped to shield the U.S. Patent Office from the falsity of the declaration in an effort to ensure that the '126 application would be granted as the '858 patent and to further ensure that Seamans would be the sole inventor listed on the face of that patent such that the patent rights would be owned solely by Crocs.

**J.     Infection of the '789 Patent by the False Seamans Declaration Submitted During Prosecution of the '858 Patent**

121.     Crocs filed U.S. Application No. 29/206,427 ("the '427 application") on May 28, 2004.

122.     The '427 application claimed priority to the '126 application.

123.   Because the '126 application is unenforceable due to the false declaration of Seamans that was filed on June 23, 2003 and not never corrected or withdrawn, the '427 application is infected by the same false declaration and is unenforceable for this reason alone.

**K.     False Seamans Declaration During Prosecution of '789 Patent**

124.   The '427 application, which sought the issuance of a design patent, claimed an "ornamental design for footwear."

125.   As filed, the '427 application included 7 figures.  Each of the figures was directed to, intended to depict, and did depict the Battiston Molded Clog, with the addition of a heel strap.

126.   Seamans was not the inventor of the Battiston Molded Clog.

127.   Upon information and belief, at the time the '427 application was filed, Seamans was aware of the Battiston Molded Clog, and that Ettore Battiston conceived of the Battiston Molded Clog.

128.   Upon information and belief, at the time the '427 application was filed, Boedecker, Hanson, Reddyhoff, FOAM and Crocs were are of the Battiston Molded Clog, and that Ettore Battiston conceived of the Battiston Molded Clog.

129.   On July 12, 2004, the U.S. Patent Office mailed a Notice to File Missing Parts of Nonprovisional Application to Townsend and Townsend and Crew, LLP, the law firm that was handling the prosecution of the '427 application for Crocs.  The notice indicated that, in order to avoid abandonment of the '427 application, a properly signed oath or declaration in compliance with 37 CFR 1.63 was required.  The notice provided two months for this correction.

130.   On September 13, 2004, an oath by Seamans was submitted.  Upon information and belief, the declaration was signed by Seamans on September 7, 2004.

131.     Among other things, the declaration stated:

I believe I am the original, first and sole inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled: FOOTWEAR, which was filed on May 28, 2004, and assigned serial number 29/206,427.

I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.  I acknowledge the duty to disclose information which is material to patentability as defined in Title 37, Code of Federal Regulations, Section 1.56.

132.     Because Seamans was not "the original, first and sole inventor of the subject matter which is claimed and for which a patent [was] sought," the Seamans declaration was false.

133.     In addition to the concerns raised with submitting a false statement under oath, the misrepresentation of inventorship contained in the Seamans declaration was material to the patentability of the '427 application because inventorship is a critical requirement for obtaining a patent.

134.     Upon information and belief, Seamans, Crocs, and the prosecuting attorneys, each had, or should have had, personal knowledge of the falsity of the Seamans declaration submitted to the U.S. Patent Office on September 13, 2004.  In particular, both Seamans and Crocs knew that Seamans did not invent, let alone solely invent, the Battiston Molded Clog.  Therefore, both Seamans and Crocs knew or should have known that Seamans did not invent the design claimed in the '427 application, which was the Battiston Molded Clog with a strap.

135.     Seamans, Crocs, and the attorneys prosecuting the '427 application all owed a duty of candor to disclose material information to the U.S. Patent Office during the pendency of the prosecution of the '126 application, up to at least March 28, 2006 when the patent issued.  Upon information and belief, Seamans, Crocs, and the attorneys prosecuting the '427 application

55

intended to deceive the U.S. Patent Office by knowingly causing the false Seamans declaration to be submitted in connection with the '427 application and then failing to correct it for the nearly two year pendency of the prosecution.  Upon information and belief, Seamans and Crocs hoped to shield the U.S. Patent Office from the falsity of the declaration in an effort to ensure that the '427 application would be granted as the '789 patent and to further ensure that Seamans would be the sole inventor listed on the face of that patent such that the patent rights would be owned solely by Crocs.

136.    At no time during the prosecution of the '427 application did Seamans, Boedecker, Hanson, Croghan, Hoverstock, Marks, McCarvel, Rebich, Reddyhoff, Smach, Snyder, FOAM, Crocs, or anyone else associated with the prosecution of the application inform the U.S. Patent Office that the Seamans declaration was false.

**L.    Failure to Disclose Material Information**

137.    Upon information and belief, during the prosecution of both the '858 patent and the '789 patent, Seamans, Crocs, and the prosecution attorneys failed to disclose the following information material to patentability:

a.    the identity of Ettore Battiston, the fact that he conceived of, at least, a substantial and material portion of the '858 patent and the '789 patent, and the fact that Seamans, at best, derived substantial and material portions of the '858 patent and the '789 patent from Ettore Battiston;

b.    that the applications which issued as the '858 patent and the '789 patent did not name the correct inventorship;

c.      the prior sales of a shoe as depicted in the drawings for the '858 patent and the '789 patent more than one year before the filing dates of the applications for the patents-in-suit by an entity known as "Finproject, N.A." and/or Foam Creations, Inc.

d.      the prior art design and prior sales of a shoe known as WALDIES sold by Walden Sports in the United States prior to the applications for the patents-in-suit.

e.      the prior art design and prior sales of a shoe known as the EXPLORER sold by Holey Soles Holdings, Ltd. a Canadian company prior to the applications for the patents-in-suit.

f.      Crocs' and/or Seamans' own prior public marketing, sale, and/or offer for sale of the shoe embodied in the '858 patent and the '789 patent as early as July 2002 prior to the applications for the patents-in-suit.

g.      Italian utility Patent No. 00245068 held by BIHOS S.R.L. (an Italian shoe designer and manufacturer), issued March 19, 2002 (based on Patent Application No. 00068 filed June 22, 1998), more than one year prior to the initial filing date of the Crocs applications for the patents-in-suit.

h.      the Calzuro Molded Clog with a strap, which was sold in the U.S. more than one year prior to the initial filing date of the Crocs applications for the patents-in-suit.

138.    Upon information and belief, deceptive intent is evidenced by the fact that the withheld references were known by Crocs, Seamans, and/or the prosecuting attorneys, were clearly material, and were not disclosed to the United States Patent and Trademark Office as required under 37 C.F.R. §1.56.

139.     Deceptive intent is further exemplified by Crocs' admission in the reexamination of the '789 patent that it sold "a shoe in the US on December 13, 2002 that fell within the scope of the ['789 patent]."  Neither Crocs, Seamans, or the prosecuting attorneys ever brought such sales to the attention of the U.S. Patent Office during the original prosecution, instead electing to do so in the reexamination when it knows that the U.S. Patent Office can only consider prior art in the form of publications and cannot consider prior sales.

140.     Deceptive intent is further exemplified by the copyright agreement between Crocs' predecessor and L'Artigiana Stampi, signed by Crocs' representative during the course of the prosecution of both the '858 patent and the '789 patent.  Upon information and belief, this agreement was intentionally withheld from the U.S. Patent Office during the prosecution of the patents as Crocs, Seamans, and/or the prosecuting attorneys knew that the agreement, which confirms that Seamans is not and cannot be the sole inventor of the patents, would have resulted in the rejection of the pending patent applications.

141.     Intent to deceive is further evidenced by the fact that Crocs initially sold clogs bearing the Rebound brand name with a sticker added by Crocs to include the Crocs logo on the clogs.

142.     Intent to deceive is further evidenced by the fact that if it had named any additional inventors on the '789 patent and/or the '858 patent, those additional individuals would have held ownership rights in the patents, and Crocs and/or Seamans would presumably either have had to pay those individuals royalties, or buy their ownership rights.

143.     Intent to deceive is further evidenced by the fact that, upon information and belief, Crocs has initiated lawsuits to exclude all competitive clog-type footwear from the market

with the sole exception of the Calzuro Molded Clog.  Upon information and belief, Crocs did not

pursue litigation against Calzuro because it knew that the BIHOS Patent and the sales of the

Calzuro Molded Clog in the United States would have invalidated at least the '858 patent.

144.     To the extent that the '858 patent is found to be unenforceable, the '789 patent is

also infected by the same inequitable conduct and likewise unenforceable.

**M.     False Seamans Declaration During Reexamination of '789 Patent**

145.     Crocs, Seamans, and the attorneys prosecuting the reexamination of the '789

patent also committed, and are continuing to commit, inequitable conduct during the

reexamination of the '789 patent.  On July 29, 2013, Seamans and Crocs filed false and material

statements including that Seamans is "the sole inventor of the U.S. Design Patent No. D517,789"

and that "the drawings of the '416 Application [Application No. US 10/602,416] and '126

Application [Application No. US Application No. 10/603,126] were renderings of a strapped

shoe that [Seamans] designed."  Seamans signed the declaration on June 17, 2013, which

includes a statement that the statements therein "were made with the knowledge that willful false

statements . . . may jeopardize the application or any patent issued thereon." Upon information

and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel, and Smach by virtue of their

positions as officers and/or directors of Crocs each participated in, or ratified, or acquiesced in

the decision to file the false declaration.

146.     Due to the prior existence of the Battiston Drawings disclosing the elements of

the shoe as it appears in the '789 patent, and the knowledge of Crocs and Seamans thereof, these

statements as to Seamans' inventorship were and are knowingly false. However, none of Crocs,

Seamans, or the prosecuting attorneys has sought to withdraw or correct the declaration submitted on July 29, 2013.

147.    In addition to the concerns raised with failing to disclose to the U.S. Patent Office that a false statement under oath had previously been submitted, the continued misrepresentation of inventorship contained in the Seamans declaration was and is material to the patentability of the '789 patent because inventorship is a critical requirement for obtaining a patent.  If Seamans, Crocs, or any of the prosecuting attorneys discloses to the U.S. Patent Office that the Seamans declaration was and is false, the U.S. Patent Office would rejected the '789 patent as unpatentable at least until such time as the false oath was withdrawn and the inventorship corrected.

148.    The deceptive intent is evidenced by the fact that neither Seamans nor Crocs has sought to correct or withdraw the false declaration of Seamans submitted to the U.S. Patent Office on July 29, 2013.  To the contrary, Crocs has continued arguing to the U.S. Patent Office that the patent, which lists Seamans as the sole inventor, should be confirmed.  Deceptive intent is further evidenced by the passage of each day following the filing of the instant claims in which Crocs fails to withdraw or correct the declaration of Seamans, as the instant claims provide Crocs detailed notice as to the falsity of the declaration.

149.    Due to the ongoing pendency of the reexamination of the '789 patent, and the failure to withdraw or correct the false declaration by Seamans, the inequitable conduct committed during the reexamination by Crocs, Seamans, and the attorneys prosecuting the reexamination of the '789 patent remains ongoing.

**FRIST CLAIM FOR RELIEF**

**ACTUAL MONOPOLIZATION IN VIOLATION OF SECTION 2
OF THE SHERMAN ACT (15 U.S.C. § 2)
(against Boedecker, Croghan, Frasch, Hanson, Hart, Hoverstock, Lasher, Lococo,
Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, Snyder,
and John and Jane Does 1 through 30)**

150.     Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 149 above.

151.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade or commerce among the States.

152.     The relevant product market (or submarket) for antitrust purposes in this case is defined as molded clog-type footwear.  There are no reasonable substitutes for molded clog-type footwear and consumers do not consider these clogs to be reasonably interchangeable with other types of footwear.  The cross-elasticity of demand between molded clog-type footwear and other types of footwear is extremely low, as indicated by the following facts.

a.     The molded clog is defined by two components. "Molded" indicates that the shoe is created by injecting rubber, plastic or a composite compound into a mold.  Such shoes can be mass produced quickly and inexpensively and are lightweight so they can be shipped quickly and inexpensively.  "Clogs" are generally known as a shoe with an open back and closed toe configuration with a relatively flat heel.  A clog has a distinctive look – the "silhouette" that Crocs has built its brand identification around, as Crocs touts in a document related to its advertising campaign, "Find Your Fun," which is attached hereto as Exhibit S, and incorporated by reference herein.  The molded clog looks and feels different than other types of shoes, like sandals, flip flops or traditional deck shoes (e.g., Sperry Topsiders).

b.      Crocs itself makes a distinction between its own "Clog" shoes and "non-fully molded casual footwear," such as sandals or flip flops.  It reports sales figures for its molded clogs separately from other product categories and Crocs' molded clog products have recently comprised between 40 and 50% of Crocs' overall sales, as shown in Exhibit AI, which is attached hereto and incorporated by reference herein.  Most significantly, from the perspective of marketing the different product types to consumers, Crocs' website and other marketing materials separate out the molded clog-type shoes from other types of footwear, including sandals and flip flops.  Clogs, sandals and flip flops are each listed as a separate "type" of shoe (i.e., their own product categories) on the Crocs website.  An illustration of a portion of Crocs' website, as it appeared on July 28, 2016, is attached hereto and Exhibit U and incorporated by reference herein.

c.      Crocs itself describes the molded clog (or in Crocs' parlance, "the Classic") as being in its own product category., calling it over time a "unique" "totally new" "different" "category" of footwear.  In its filings with the SEC, Crocs has described its "classic Croc" – the molded clog-type shoe line that it sells – as "an innovative shoe unlike any other footwear model then available" (Exhibits AB–AE), "a shoe unlike any other footwear model then available" (Exhibits. Y, Z, AA), and as recently as 2013 bragged that "the Classic . . . has established a new category in the footwear marketplace" (Exhs. V–X). In its 2015 national advertising campaign, Crocs boasted that, when it introduced the classic Clog, "It was a new kind of shoe" and Crocs aren't like other types of shoes. (Exhibit S).  (Of course this last statement was partially false; other companies such as Waldies were already selling the exact same shoe as Crocs, manufactured in the same plant, and others, such as Holey Soles had their

own molded clog type shoe on the market before Crocs. Exhibit P).  For example, in an article attached hereto as Exhibit AF and incorporated by reference herein, Crocs' former CEO Snyder is quoted to have said "We believe Crocs has established a new category in footwear and the brand is growing stronger every day."  As another example, in a US News article attached hereto as Exhibit AG and incorporated by reference herein, Crocs CEO Snyder is quoted to have said "We've created a new category of footwear, and we're not fine with people who have infringed on the patents [of] our first shoes."  As another example, in a Fortune article attached hereto as Exhibit AH and incorporated by reference herein, Crocs' COO Hanson stated "We've created our own category of footwear."

d.      Others in the footwear industry also describe the molded clog as a different type of product, in its own category.  For example, as shown in Exhibit T, which is attached hereto and incorporated by reference herein, Crocs have been described by an industry expert as having "challenged key industry assumptions and conventions by creating a brand new type of casual shoe, a clog that was partly a shoe and partly a sandal."

e.      The manner in which retailers display the molded clogs on their own, separate and apart from other categories of shoes – including Crocs' branded sandals and flip flops, which are typically in a separate section, with other brands of sandals and flip flops – is an indicia that retailers and consumers view the molded clog as its own product category.

f.      Some of the distinctive characteristics identified by Crocs that separate out the molded clog include: (i) waterproof; (ii) super comfortable; (iii) ventilated; (iv) breathable; (v) non-slip sole; (vi) washable, (vii) resistant to odors or odor free, and (viii) durable.  While other types of footwear may share one or more of the functional advantages or characteristics of

the molded clog, none have a sufficient number of those attractive features for consumers to switch to those other types of shoes and thus are not true substitutes and are outside the product market.

(i)     One example of footwear distinguishable from the molded clog is the traditional deck shoe (e.g., a leather or canvas Sperry Topsider).  Crocs originally marketed its molded clog as perfect for the boating crowd because it could be worn in the water (or when wet) and then still be worn on dry land or boat.  However, unlike the traditional deck shoe, a the molded clog has holes on the sides of the front of the shoe and an open back to allow water to quickly drain out of the shoe, is easily taken on or off the foot, won't get moldy if left wet or retain bacteria, won't stain, doesn't change shape or size or exude an odor after getting wet and then drying, dries quickly to reduce chafing, is breathable (and thus more comfortable), has a contoured padded footbed that purportedly reduces foot and back pain, is much less expensive, is more durable.

(ii)    Another example of footwear distinguishable from the molded clog is the flip flop or slide.  Those types of footwear are much less expensive than the Crocs molded clog and if they were a true substitute, then Crocs would not have the level of sales that it has enjoyed over the last 10 years.  The flip flop and slide do not have a strap in the back to keep the shoe on securely, provides no protection for the foot from scrapes or falling objects, do not provide stability when walking and are not amenable to image and product licensing (e.g., the Jibitz ornaments that Crocs sells to fit in the holes in its molded clogs, and the Disney character molded clogs that have the character's face painted on the front of the clog (where it can be seen while the clog is on the foot).

(iii)     A third example of footwear that is distinguishable from the molded clog is the comfort casual or dress shoe (*e.g.,* Eccos or Rockports).  Those products are typically made of leather or suede, have a more expensive and longer production and shipping process, stain, get moldy or bacteria laden when wet, are not made to transition from wet to dry (and many of the other factors that differentiate the molded clog from the traditional deck shoe).

g.     The molded clog is also in its own product category under the non-transitory price increase test favored by economists and adopted by the courts: would consumers switch to another product if there was a not insignificant (typically 5-10%) increase in the price of the original product?  One need not speculate about this point, because history proves the point. Consumers were willing to switch from one molded clog to another (*e.g.,* from an expensive Croc priced at $34.99 with its false claim that it was made of a patented, superior Croslite material) to a less expensive molded clog; in 2003-06, there was robust price competition, Waldies had a large market share and Crocs itself recognized that, without a patent to put competitors out of business, it would lose market share and need to reduce its prices. Exhibit B.  Once Crocs procured its patents in 2006 and began enforcement proceedings, these lower priced alternatives disappeared from the market (or were relegated to the fringes), and Crocs raised its price.  Instead of losing sales to lower priced non-fully molded sandals or flip flops (which can be purchased for less than $10 per pair), Crocs' sales went higher and higher.

153.     The relevant geographic market for antitrust purposes is the United States.  Some of the reasons that this is a properly defined, sufficiently narrow market, are that:

a.     This is the "area of effective competition" in which the molded clogs or their reasonably interchangeable substitutes are traded (e.g., bought and resold by retailers or

sold directly by manufacturers to the end consumers from branded stores or kiosks). The ultimate question, certainly according to the Tenth Circuit Court of Appeals, is "which territories are found to constitute the terrain in which competition takes place."

b.      In cases arising from patent enforcement, it is common to define the market as the United States, because that is the market in which the patent can provide a virtual monopoly for the patent holder, and in which no one else can effectively compete because of the almost insurmountable barrier to entry that the patent provides.

c.      Upon information and belief, in the footwear industry, sales to brick and mortar retailers for resale to consumers within the United States is commonly viewed by manufacturers as its own separate market. This is due, in part, to the manner in which the fashion trends in the United States are different than in other countries, as are the channels of retail distribution and the buying procedures of U.S. retailers.

d.      Upon information and belief, economic studies have shown that internet sales to US consumers from outside of the United States do not significantly affect consumers' buying habits or significantly alter the competition among traditional brick and mortar retailers.

e.      Crocs' own public statements confirm the plausibility of such a geographic market. In its SEC filings, Crocs breaks out its U.S. sales separately from its sales outside the country, Exhibits V–Z, AA–AE, and in its sales materials, it splits out the U.S. as a separate geographic market when it lists Crocs' "six key markets: U.S., U.K., Germany, China, Japan and South Korea." Exhibit S.

154.    Crocs has monopoly power in the relevant market, including the power to control price and exclude competitors, due in part to the high barriers to entry into the market.

155.    The significant and high barriers to market entry that prevent other manufacturers from rapidly and meaningfully entering and/or expanding in this relevant market, include, but are not limited to, the following:

(a)     Crocs' dominant market position;

(b)     Crocs' status as a monopolist and history of engaging in exclusionary and anticompetitive conduct to eliminate competition;

(c)     Crocs' possession and/or assertion of purported patents, trademarks, and other intellectual property rights (valid or otherwise) relating to molded clog-type footwear products;

(d)     the substantial up-front capital investment required to penetrate and enter the relevant market;

(e)     the significant lead time required to design molded clog-type footwear products and develop a reputation such that the products can be successfully marketed and sold to buyers; and

(f)     the requirement of access to a nationwide sales and distribution network. Indeed, Crocs admitted that its plan to gain dominance in the then-competitive market in 2006 was to procure patents and drive competitors out of the market, even before it had procured any patents.  In the prospectus that Crocs filed with the SEC in conjunction with its February 2006 IPO, Crocs stated that, without the constraints that it could place on its competitors, it would be just one of many competitors and would lose market share.  Exhibit B.  The fraudulent procurement of its cornerstone patents created an insurmountable barrier to entry for other companies to compete in the product market.  The manner in which Crocs expanded its market

share in its early years – through acquisitions of other companies and other product lines (such as Jibitz) demonstrates that scale and size was another barrier to entry.  In order to compete with Crocs for the business of the brick and mortar resellers (where the vast majority of Crocs' sales are made), a competitor would need a robust supply network and the ability to manufacturer and ship product very quickly.  Unlike the traditional footwear manufacturer who typically sells its full seasonal stock of a shoe to its retail outlets six months in advance and has no inventory when particular models of a product line sells out, Crocs altered the supply chain for footwear with its ability to quickly restock retailers with any size or style of its molded clog-type footwear.  See Exhibit T.

156.    Crocs' power to control price and exclude competitors is reflected by, *inter alia*, Crocs' substantial share of the molded clog-type footwear products market, its ability to exclude competition in the market due to the improper benefit is enjoys due to the ITC Exclusion Order, and its ability to charge supra-competitive prices for its molded clog-type footwear products. For example, upon information and belief, upon securing the ITC Exclusion Order, Crocs raised the prices for its molded clog-type footwear products in the United States.  Additionally, due to Crocs' campaign of anticompetitive conduct, a significant number of other competitors have exited the market, including Collective Licensing International, Effervescent, Inc., Gen-X Sports, Inc., Holey Soles Holding Ltd, Australia Unlimited, Inc., Cheng's Enterprises, Inc., Inter-Pacific Trading Corp, Pali Hawaii of Honolulu, Shaka Shoes, and Old Dominion Footwear, Inc.

157.    Crocs' monopoly position in the relevant market has been acquired and maintained through clearly intentional exclusionary conduct and patent misuse, as opposed to

business acumen, historic accident, or by virtue of offering a superior product or service, greater efficiency, or lower prices.

158.     The patent system, and by extension, the various parts of the judicial system in which patents can be enforced, serves to encourage innovation.  However, because the patent system depends on the candor, good faith, and honesty of those who seek its protection and enjoy its benefits, the patent system is subject to misuse.

159.     As set forth in, 37 C.F.R. § 1.56, the U.S. Patent Office imposes on those associated with the filing of a patent application, including patent practitioners and named inventors, a duty to disclose information material to patentability.  This duty also applies during the reexamination of a patent.  One who acts fraudulently in obtaining a patent, or during the reexamination of that patent, necessarily knows that the patent is unenforceable.  As set forth herein, the '858 patent and the '789 patent were the result of inequitable conduct, fraudulent conduct, or both, by individuals who owed and/or continue to owe a duty of candor to the U.S. Patent Office, including at least Crocs and Seamans.

160.     Furthermore, following a patent grant, the assertion of patent rights against competitors and others beyond the scope of the issued patent constitutes patent misuse and renders the underlying patent invalid and unenforceable.  Thus, based on the acts of Crocs together with the Defendants both prior to and subsequent to the issuance of the '858 patent and the '789 patent, these patents are each similarly invalid and unenforceable.  Here, the conduct of the Defendants is particularly egregious as they each continue to currently rely on a false declaration submitted under oath to the U.S. Patent Office to attempt to maintain the validity of the '789 patent.  The Defendants' conduct exemplifies how a lack of candor, good faith, and

honesty can result in the abuse of the patent system, including the Patent Office, the Courts, and the ITC.

161.    The antitrust laws serve to foster competition.  Consequently, the statutory rights afforded by patent laws do not support the impermissible broadening of the physical or temporal scope beyond that explicitly articulated in the claims of a patent grant, nor do intellectual property laws confer upon the patent owner immunity or a privilege to violate antitrust laws.  A purported patent holder violates the antitrust laws by bringing or maintaining a baseless suit to enforce a patent with knowledge that the patent is invalid, that the patent rights asserted extend beyond the scope of the patent grant, or that the defendant sued is not infringing, such that the litigation is conducted solely, or at least primarily, to suppress competition.

162.    Upon information and belief, the Defendants initiated, prosecuted, and maintained objectively meritless patent infringement actions in bad faith with the knowledge that its patents were and are invalid and unenforceable and/or that the accused products and sellers did not and do not infringe.

a.    Boedecker, as Crocs co-founder, owner and president of Crocs predecessor company Western Brands, and member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding at the time knowing that his actions were unlawful.

b.    Croghan, as a member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit, the ITC Proceeding, the 2012 amendment to bring

infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

c.      Frasch, as a member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, and the initiation and maintenance of the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

d.      Hanson, as a co-founder of Crocs, Crocs Chief Operating Officer from July 2002 through January 2005, owner and member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding at the time knowing that his actions were unlawful.

e.      Hart, as Crocs General Counsel, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, and the initiation and maintenance of the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

f.      Hoverstock, as Crocs Associate General Counsel for Intellectual Property, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the 2016 CVS lawsuit at all times knowing that her actions were unlawful.

g.      Lasher, as a Crocs senior officer, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, and the initiation and maintenance of the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

h.      Marks, as a member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, at all times knowing that his actions were unlawful.

i.      Melwani, as a member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the initiation and maintenance of the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

j.      McCarvel, as a senior officer of Crocs, its chief executive officer, and a member of its board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, and the initiation and maintenance of the 2012 amendment to bring infringement claims against USA Dawgs, and the 2012 CVS lawsuit, at all times knowing that his actions were unlawful.

k.      Rebich, as General Counsel, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, at all times knowing that his actions were unlawful.

l.      Reddyhoff, as president of co-conspirator FOAM, and as an officer of Crocs from 2004 to 2008, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

m.      Rees, as Crocs President and Principle Executive Officer, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the initiation and maintenance of the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

n.      Ribatt, as Crocs Chief Executive Officer and a member of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the initiation and maintenance of the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

o.      Smach, as the Chairman of Crocs board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring

infringement claims against USA Dawgs, the 2012 CVS lawsuit, and 2016 CVS lawsuit at all times knowing that his actions were unlawful.

p.  Snyder, as Crocs Chief Executive Officer from 2004 to 2009, and a member of its board of directors, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, at all times knowing that his actions were unlawful.

q.  Margolis, as Vice President of Sales and Marketing for Crocs starting in January 2005, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, the 2012 amendment to bring infringement claims against USA Dawgs, the 2012 CVS lawsuit, and the initiation and maintenance of the 2016 CVS lawsuit at all times knowing that his actions were unlawful.

r.  Lococo, as senior officer of Crocs, serving in a variety of positions including as its director of investor relations, knowingly engaged in an unlawful antitrust scheme by participating in, ratifying or acquiescing to the initiation and maintenance of the 2006 Lawsuit and the ITC Proceeding, at all times knowing that his actions were unlawful.

163.  The thrust of Plaintiffs' patent-related antitrust claims is that Crocs and Seamans with the assistance of George B. Boedecker Jr., Lyndon "Duke" Hanson, Raymond Croghan, Ronald Frasch, Daniel Hart, Sara Hoverstock, Jeffrey Lasher, Donald Lococo, Michael Margolis, Michael E. Marks, Prakash Melwani, John P. Mccarvel, Erik Rebich, Andrew Reddyhoff, Andrew Rees, Gregg Ribatt, Thomas J. Smach, and Ronald Snyder: (1) fraudulently procured patents from the U.S. Patent Office by failing to disclose proper inventorship as well as known

material, invalidating prior art, and prior sales; and (2) initiated bad-faith and sham patent infringement litigation intended for the purpose of securing and preserving an unlawful monopoly and driving Crocs' competitors, including Plaintiffs, out of the market. Crocs with the Defendants took steps to enforce the '858 patent and '789 patent against Plaintiffs even, upon information and belief, knowing that these patents were obtained and/or maintained through fraud. Upon information and belief, Crocs also initiated patent infringement litigation against Plaintiffs, CVS, and others, based on invalid patents, that was a mere sham to disguise what was nothing more than an anticompetitive plan to interfere directly with Plaintiffs' actual and potential business relationships.

164.    Upon information and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel and Smach caused Crocs to sue USA Dawgs (or participated in, acquiesced or ratified the decision to sue USA Dawgs), resulting in Crocs' claims against USA Dawgs set forth in Crocs' First Amended Complaint.

165.    Upon information and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel and Smach caused Crocs to sue CVS (or participated in, acquiesced or ratified the decision to sue CVS), resulting in the filing of Civil Action No. 12-cv-02096 in the United States District Court for the District of Colorado.

166.    Upon information and belief, Croghan, Frasch, Hart, Hoverstock, Lasher, McCarvel and Smach caused the filing of (or participated in, acquiesced or ratified the decision to file), a false declaration by Seamans with the U.S. Patent Office in Reexamination Control No. 95/002,100 on or about July 29, 2013.

167.    Upon information and belief, Boedecker, Hanson, Croghan, Frasch, Hart,

Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder have and are continuing to cause Crocs to continue to assert the '858 patent and the '789 patent against Double Diamond, USA Dawgs, and CVS, despite their knowledge that both patents are invalid and/or unenforceable (or have participated in, acquiesced or ratified the decision to continue to assert those patents).

168.   Upon information and belief, Crocs and Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder have ordered, authorized, initiated and/or maintained sham patent infringement litigation or participated in, ratified or acquiesced in Crocs' decision to do so, against Plaintiffs and others with the intent to deter other would-be market entrants and to force Plaintiffs and others out of the relevant market.  Upon information and belief, this Action and other similar litigations were undertaken and are maintained and prosecuted solely to interfere with free and open competition and without a legitimate expectation that such efforts would in fact induce or result in proper lawful relief from a legal tribunal.

169.   Crocs' litigation against Plaintiffs is objectively baseless because Crocs could not realistically expect to ultimately succeed.  The intentions of Crocs and the Defendants are particularly evident at present as Crocs still refuses to withdraw its complaints against Plaintiffs. Upon information and belief, Crocs also specifically intended through its sham litigation to interfere with Plaintiffs' business relationships and it did indeed interfere with Plaintiffs' business relationships.

170.   Even if the patents asserted by Crocs were not fraudulently obtained and maintained in reexamination proceedings (with the help of Seamans, both during and after his

term of employment with Crocs), the Defendants have still violated the antitrust laws by instituting and/or maintaining patent infringement litigation against Plaintiffs based on the '858 patent and the '789 patent in bad faith as the Defendants have no reasonable basis for believing that the patents are valid and enforceable.  Upon information and belief, this litigation was initiated and pursued with the intent to monopolize the relevant market without regard for its smaller rivals or the degree, the nature or the amount of the alleged infringement.

171.    As specifically detailed above, the '789 patent and the '858 patent are unenforceable.  Even if not unenforceable, both the '789 patent and the '858 patent are invalid, at least as anticipated and/or obvious, based on the prior art that the U.S. Patent Office has never had an opportunity to consider.  For example, the BIHOS Patent and the associated Calzuro Molded Clog with a strap sold in the U.S. years before both the '789 patent and the '858 patent were filed renders both of those patents invalid, particularly in view of the scope in which Crocs has applied to those patents in asserting them.  Moreover, the '789 patent is invalid at least for the reasons set forth in the rejection of that patent by the U.S. Patent Office during reexamination.  Moreover, even if Crocs and Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder  held or continue to hold the objectively baseless view that the patents are not invalid for these reasons, both patents are invalid for incorrect inventorship, and upon information and belief, neither Crocs nor Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach or Snyder has taken any steps to correct the inventorship.

172.    Plaintiffs each have the requisite standing to assert antitrust claims because they are each competitors of Crocs and participants in the relevant market and have suffered damages as a direct consequence of the actions of Crocs, Seamans, and Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder.

173.    Upon information and belief, the anticompetitive scheme to monopolize or attempt to monopolize the above-described relevant market has been executed with the intent to specifically eliminate Plaintiffs as viable competitors and threat to Crocs' molded clog-type footwear monopoly, and to suppress competition in general.  Upon information and belief, the overall exclusionary scheme to monopolize the market consists of at least the following anticompetitive acts/conduct to be viewed as a whole:

(a)     fraudulently obtaining patents with the intent to monopolize;

(b)     engaging in patent misuse by asserting patent rights far beyond the narrow scope of the patent grant with the intent to create a monopoly;

(c)     threatening, initiating and maintaining bad faith infringement litigation predicated on these patents which were obtained through fraud or inequitable conduct;

(d)     threatening, initiating and maintaining sham and baseless litigation predicated on these patents obtained through fraud or inequitable conduct;

(e)     seeking and obtaining the government sanctioned legal protection of a General Exclusion Order from the ITC based on known invalid and unenforceable patents;

(f)      continuing and increasing baseless litigation after being presented with information demonstrating the invalidity of its patents;

(g)      initiating sham litigation against the largest customers of USA Dawgs based on these invalid and unenforceable patents; and

(h)      seeking to maintain the '789 patent in a reexamination proceeding through the submission of knowingly false statements.

174.    Conduct is anticompetitive when it improperly excludes or handicaps competitors in order to gain or maintain a monopoly.  Anticompetitive or exclusionary practices are acts designed to deter potential rivals from entering the market, intervening or preventing access to customers, or preventing existing rivals from increasing their output.  Anticompetitive acts are not fair competition on the merits of price, quality or other factors, but instead acts that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  Conduct by a monopolist that constitutes a deliberate effort to discourage and thwart customers from doing business with its rivals is anticompetitive.

175.    The anticompetitive and exclusionary conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder described herein is not motivated or driven by technological or efficiency concerns, and has no valid or legitimate business justification.  Rather, upon information and belief, its clear purpose and effect is solely to ensure that Plaintiffs and other competitive rivals cannot successfully invade or erode Crocs' dominant and entrenched market position.

176.     During the relevant time period, Crocs and Plaintiffs have both designed, manufactured, marketed, and sold molded clog-type casual footwear products in the United States.  The marketing, distribution and sale of such products directly involves, and substantially affects, interstate commerce. The violations of the Sherman and Clayton Acts alleged herein adversely, directly, and substantially impact the flow of such products in interstate commerce.

177.     As alleged herein, Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder have engaged in an anticompetitive and exclusionary scheme to prevent  Plaintiffs and other competitors from manufacturing and selling competing molded clog-type footwear products, all for the purpose of maintaining and increasing Crocs' controlling market share and improperly sustaining supra-competitive pricing on its molded clog-type footwear products.

178.     The conduct of Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder has caused and produced antitrust injury, and unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

(a)     competition in the design, development, distribution, and sale of molded clog-type footwear products has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated;

(b)     barriers to entry into the relevant market have been raised;

(c)     consumer choice has been, and will continue to be, significantly limited

and constrained as to selection, price and quality of molded clog-type footwear products;

(d)     consumer access to Plaintiffs' competitive molded clog-type footwear products will be artificially restricted and reduced, and Plaintiffs' products will continue to be excluded from the market;

(e)     the market for development, distribution, and sale of molded clog-type footwear products will continue to be artificially restrained or monopolized; and

(f)     Crocs will continue to charge supra-competitive prices for these products to the detriment of consumers (who have already overpaid hundreds of millions, if not billions, of dollars to purchase molded clogs from Crocs).

179.     The exclusionary conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder has caused antitrust injury to Plaintiffs, the industry, and to consumers.  Antitrust injury based upon a bad-faith patent prosecution claim and impermissibly broad assertion of a patent grant is satisfied by (1) loss of customers, and (2) costs incurred in defense of the prior patent infringement suit and subsequent costs because such losses and costs are injuries which flow from the antitrust wrong.

180.     By reason of, and as a direct and proximate result of, the anticompetitive and exclusionary practices and conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder, Plaintiffs have suffered, and will continue to suffer, financial injury to its business and property.  As a result, Plaintiffs have been deprived of revenue and profits they would have otherwise made, suffered diminished market

growth, and sustained a loss of goodwill.

## SECOND CLAIM FOR RELIEF

### ATTEMPTED MONOPOLIZATION IN VIOLATION OF
### SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)
**(against Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, Snyder, and John and Jane Does 1 through 30)**

181.     Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 180 above.

182.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, attempts to monopolize any part of the trade or commerce among the States.

183.     The relevant product market (or submarket) for antitrust purposes in this case is defined as molded clog-type footwear products.  There are no reasonable substitutes for molded clog-type footwear and consumers do not consider these clogs to be reasonably interchangeable with other types of footwear.  The cross-elasticity of demand between molded clog-type footwear and other types of footwear is extremely low.  The relevant geographic market for antitrust purposes is the United States.

184.     Crocs dominates the relevant market, and upon information and belief, possesses a market share greater than 90%.

185.     The conduct and practices of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder are anticompetitive and exclusionary.  Their overall unlawful scheme is described above, for example, in paragraphs 2 to 3, 69 to 74, and 162 to 178.

186.   Plaintiffs have the requisite standing to assert antitrust claims because they are competitors of Crocs and participants in the relevant market and have suffered damages as a direct result of Crocs' actions.

187.   Absent action by this Court to enjoin and preclude Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder from continuing their anticompetitive and exclusionary conduct, there is a dangerous probability that Crocs will obtain a monopoly in the relevant market for molded clog-type footwear products (or continue to monopolize that market), including the power to set prices, reduce output, or exclude competition in the market.

188.   Upon information and belief, Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder have undertaken their clearly anticompetitive and exclusionary conduct with the purpose of monopolizing, and with the deliberate and specific intent to monopolize the market for molded clog-type footwear products in the United States.  Upon information and belief, Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder specifically intend to eliminate, destroy or foreclose meaningful competition in the relevant market through the tactics described above.  The conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder discourages and/or precludes

buyers/distributors of molded clog-type footwear products from dealing with or buying from competing manufacturers, such as Plaintiffs. Upon information and belief, the scheme of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder is designed to exclude and thwart competition while allowing Crocs to charge supra-competitive prices for its molded clog-type footwear products.

189.     As described above, in paragraph 155 for example, significant and high barriers to market entry exist that preclude or discourage new manufacturers from entering the relevant market. Significant barriers to expansion also exist, which is evidenced by the fact that only a small number of competitors have managed to marginally penetrate this market, many have exited the market, and none have managed to capture more than a nominal market share.

190.     The anticompetitive acts of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder affect a substantial amount of interstate commerce in the relevant market and constitute attempted monopolization in violation of Section 2 of the Sherman Act. Their conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justification. Instead, upon information and belief, its purpose and effect is to preserve and promote its monopoly position and market stranglehold, to the detriment of consumer welfare, Plaintiffs, and to Crocs' other competitive rivals in the relevant market.

191.     The anticompetitive acts of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks,

Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder have caused substantial economic injury to Plaintiffs and have also injured competition in the relevant market by, *inter alia*, foreclosing, lessening, and eliminating competition and depriving buyers/distributors from securing lower-cost or higher-quality alternatives for molded clog-type footwear products.

192.    As described, for example, in paragraphs 69 through 74, the conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder has caused and produced antitrust injury, and unless enjoined by this Court, will continue to produce anticompetitive, exclusionary, and injurious effects upon competition in interstate commerce.

193.    The exclusionary conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder has caused antitrust injury to Plaintiffs, the industry, and consumers.  Antitrust injury based upon a bad-faith patent prosecution claim and bad-faith assertion of the impermissibly broadened scope of a patent grant is satisfied by (1) loss of customers, and (2) costs incurred in defense of the prior patent infringement suit and subsequent defensive efforts because such losses and costs are injuries which flow from the antitrust wrong.

194.    By reason of, and as a direct and proximate result of, the practices and conduct of Crocs, Seamans, and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Smach and Snyder, Plaintiffs have suffered and will continue to suffer financial injury to its

business and property.  As a result, Plaintiffs have been deprived of revenue and profits they would have otherwise made, suffered diminished market growth, and sustained a loss of goodwill.

### THIRD CLAIM FOR RELIEF

### CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) (against Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, Margolis)

195.    Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 194 above.

196.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, conspiracy to restrain any part of the trade or commerce among the States.

197.    Crocs' overall unlawful scheme is described above, for example, in paragraphs 2 to 3, 69 to 74, and 162 to 178.

198.    Upon information and belief, Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis have and are continuing to conspire to continue to assert the '858 patent and the '789 patent against Double Diamond, USA Dawgs, and CVS, despite their knowledge that both patents are invalid and/or unenforceable.  In particular:

a.    Crocs, Seamans, Boedecker, Reddyhoff, Smach, Croghan, Marks, McCarvel, Snyder, and Margolis conspired during the course of the prosecution of the '858 patent and the '789 patent to conceal and withhold material information from the Patent Office. In particular, at the time of the prosecution of the patents, Boedecker was the owner of and had a separate independent interest in Western Brands, LLP which was responsible for the sale of thousands of pairs clogs, based on the Battiston Designs, prior to the filing of patent applications.

Also, Reddyhoff was the President of, and had a separate independent interest in Fin Project, N.A. (later Foam Creations acquired by Crocs in 2004 and divested in 2008) who was the affiliated manufacturer and design rights holder of the shoe that became known as Crocs Beach Model clog for years prior to prior to the filing of patent applications – material details which were not disclosed to the Patent Office.

   b. Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis  conspired during the course of the ITC proceedings in which each of Seamans, Reddyhoff and Boedecker presented testimony with the overall effect of minimizing the role or importance of the original inventor and designer Ettore Battiston, or Foam Creation's wide distribution and prior sales of the same shoe, or Reddyhoff's refusal to grant Crocs his already existing intellectual property rights in the Beach model shoe until Crocs purchased Foam Creations in 2004 – 2 years after Crocs and Seamans filed patent applications claiming inventorship of the same subject matter or Crocs knowledge of the widespread existence of invalidating prior art including ventilated molded clogs with straps such as the Clazuro Clog.

Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired during the course of the reexamination of the '789 patent – even after the termination of Seamans' employment by Crocs – to falsely assert that Seamans is the sole inventor of the '789 patent when, upon information and belief, both Crocs and Seamans both have been and remain aware that such claims are false. Reddyhoff and Boedecker also know these claims to be false, but on information and belief, were not involved in the ''789 patent reexamination proceedings.

c.      Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired and continue to conspire related to the marketing, promotion and advertising of "Croslite" as a "patented," "proprietary" or "exclusive" material when both Crocs, and the material engineer Reddyhoff, both have been and remain aware that such claims are false.

d.      Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired and continue to conspire to obtain and maintain a General Exclusion Order permitting Crocs to use the power of the Custom Border Patrol to control the domestic market molded clog-like footwear as none have sought to correct false statements, or inform the Patent Office or the ITC that the patents or general exclusion order were improperly obtained, in part, through the withholding of material information.

199.    Upon information and belief, Seamans was not employed by Crocs in 2013 or any time since.

200.    On April 29, 2013, in the reexamination of the '789 patent, the U.S. Patent Office mailed an Office Action rejecting the '789 patent as unpatentable to Crocs' attorneys representing it in that reexamination proceeding.

201.    Upon information and belief, Crocs became aware of the April 29, 2013 Office Action shortly after April 29, 2013.

202.    Upon information and belief, after receiving the April 29, 2013 Office Action, Crocs or representatives acting on its behalf contacted Crocs' then-former employee Seamans and agreed that Crocs would submit a declaration of Seamans for the purpose of convincing the U.S. Patent Office to withdraw the Office Action.  Upon information and belief, among other

things, Crocs and Seamans agreed that Seamans would declare, under oath, that Seamans was the sole inventor of the '789 patent.

203.    Upon information and belief, both Crocs and Seamans were aware that the U.S. Patent Office's rejection of the '789 patent meant that the U.S. Patent Office would cancel the patent unless the rejection was withdrawn.  Upon information and belief, both Crocs and Seamans were aware that, if the '789 patent were cancelled by the U.S. Patent Office, Crocs would face a substantial risk to obtaining and maintaining Crocs position in the market.  For example, if the '789 patent were cancelled, Crocs would no longer be able to assert that patent in litigation against anyone.  Moreover, Crocs' perceived reputation as having the ability to threaten any of its competitors or their actual or potential customers would be drastically constrained.  Further, Crocs' competitors would be able to enter the market by selling footwear that is designed around the '858 patent.  Upon information and belief, the agreement between Seamans and Crocs was undertaken with the purpose of mitigating that risk and assisting Crocs with maintaining its monopoly, thereby restraining trade.

204.    Upon information and belief, Seamans followed through with his agreement with Crocs.

205.    On June 17, 2013, Seamans signed a declaration which stated:  "I am the sole inventor of [the '789 patent]."  The declaration also stated that Seamans acknowledged that any willful false statements "are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that such willful false statements may jeopardize the application or any patent issued thereon."

206.    On July 29, 2013, Crocs filed the signed declaration by Seamans with the U.S.

Patent Office along with a request to the U.S. Patent Office that it withdraw its rejection of the '789 patent.

207.    No current or former Crocs individuals, including Crocs and Seamans have taken any steps to withdraw or correct the false declaration by Seamans.  Crocs continues to seek to benefit from the false declaration, as it continues to argue to the U.S. Patent Office that the rejection of the '789 patent should be withdrawn.

208.    Absent action by this Court to enjoin and prevent Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis from benefitting from their conspiracy, there is a dangerous probability that Crocs will continue to benefit from the conspiracy by using the '789 patent to continue to obtain and/or maintain a monopoly in the relevant market for molded clog-type footwear products, including the power to set prices, reduce output, or exclude competition in the market.

209.    Absent action by this Court to enjoin and preclude Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis from benefitting from their conspiracy, Crocs will continue to benefit from the conspiracy as it will continue to have the ability to restrain trade by obtaining and/or maintaining a monopoly in the relevant market for molded clog-type footwear products (or continuing to monopolize that market), including the power to set prices, reduce output, or exclude competition in the market.

210.    The conspiracy between Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis affects a substantial amount of interstate commerce in the relevant market and constitutes a conspiracy to restrain trade in violation of Section 1 of the Sherman Act.  The conduct of Crocs, Seamans, Boedecker, Reddyhoff, Smach,

Hart, Croghan, Marks, McCarvel, Snyder, and Margolis is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Instead, upon information and belief, its purpose and effect is to preserve and promote Crocs' monopoly position and market stranglehold, to the detriment of consumer welfare,  Plaintiffs, and to Crocs' other competitive rivals in the relevant market.

211.    The conduct of Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis has caused substantial economic injury to Plaintiffs and have also injured competition in the relevant market by, *inter alia*, foreclosing, lessening, and eliminating competition and depriving buyers/distributors from securing lower-cost or higher-quality alternatives for molded clog-type footwear products.

212.    By reason of, and as a direct and proximate result of, the practices and conduct of Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis, Plaintiffs have suffered and will continue to suffer financial injury to its business and property.  As a result, Plaintiffs have been deprived of revenue and profits they would have otherwise made, suffered diminished market growth, and sustained a loss of goodwill.

## FOURTH CLAIM FOR RELIEF

### CONSPIRACY TO MONOPOLIZE IN VIOLATION OF
### SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)
### (against Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, Margolis)

213.    Plaintiffs reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 212 above.

214.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, any conspiracy to monopolize any part of the trade or commerce among the States.

215.    Crocs' overall unlawful scheme is described above, for example, in paragraphs 2 to 3, 69 to 74, and 162 to 178.

216.    Upon information and belief, Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis have and are continuing to conspire to continue to assert the '858 patent and the '789 patent against Double Diamond, USA Dawgs, and CVS, despite their knowledge that both patents are invalid and/or unenforceable.  In particular:

a.    Crocs, Seamans, Boedecker, Reddyhoff, Smach, Croghan, Marks, McCarvel, Snyder, and Margolis conspired during the course of the prosecution of the '858 patent and the '789 patent to conceal and withhold material information from the Patent Office. In particular, at the time of the prosecution of the patents, Boedecker was the owner of and had a separate independent interest in Western Brands, LLP which was responsible for the sale of thousands of pairs clogs, based on the Battiston Designs, prior to the filing of patent applications. Also, Reddyhoff was the President of and had a separate independent interest in Fin Project, N.A. (later Foam Creations acquired by Crocs in 2004 and divested in 2008) who was the affiliated manufacturer and design rights holder of the shoe that became known as Crocs Beach Model clog for years prior to prior to the filing of patent applications – material details which were not disclosed to the Patent Office.

b.    Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired during the course of the ITC proceedings in which Seamans, Reddyhoff and Boedecker presented testimony with the overall effect of minimizing the role or importance of the original inventor and designer Ettore Battiston, or Foam Creation's wide distribution and prior sales of the same shoe, or Reddyhoff's refusal to grant Crocs his

already existing intellectual property rights in the Beach model shoe until Crocs purchased Foam Creations in 2004 – 2 years after Crocs and Seamans filed patent applications claiming inventorship of the same subject matter or Crocs knowledge of the widespread existence of invalidating prior art including ventilated molded clogs with straps such as the Clazuro Clog.

  c. Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired during the course of the reexamination of the '789 patent to falsely assert that Seamans is the sole inventor of the '789 patent when, upon information and belief, both Crocs and Seamans both have been and remain aware that such claims are false.

  d. Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired and continue to conspire realted to the marketing, promotion and advertising of "Croslite" as a "patented," "proprietary" or "exclusive" material when both Crocs, and the material engineer Reddyhoff, both have been and remain aware that such claims are false.

  e. Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis conspired and continue to conspire to obtain and maintain a General Exclusion Order permitting Crocs to use the power of the Custom Border Patrol to control the domestic market molded clog-like footwear as none have sought to correct false statements, or inform the Patent Office or the ITC that the patents or general exclusion order were improperly obtained, in part, through the withholding of material information.

  217. Upon information and belief, Seamans was not employed by Crocs in 2013 or any

time since.

218.    On April 29, 2013, in the reexamination of the '789 patent, the U.S. Patent Office mailed an Office Action rejecting the '789 patent as unpatentable to Crocs' attorneys representing it in that reexamination proceeding.

219.    Upon information and belief, Crocs became aware of the April 29, 2013 Office Action on or shortly after April 29, 2013.

220.    Upon information and belief, after receiving the April 29, 2013 Office Action, Crocs or representatives acting on its behalf contacted Crocs' then-former employee Seamans and agreed that Crocs would submit a declaration of Seamans for the purpose of convincing the U.S. Patent Office to withdraw the Office Action.  Upon information and belief, among other things, Crocs and Seamans agreed that Seamans would declare, under oath, that Seamans was the sole inventor of the '789 patent.

221.    Upon information and belief, both Crocs and Seamans were aware that the U.S. Patent Office's rejection of the '789 patent meant that the U.S. Patent Office would cancel the patent unless the rejection was withdrawn.  Upon information and belief, both Crocs and Seamans were aware that, if the '789 patent were cancelled by the U.S. Patent Office, Crocs would face a substantial risk to obtaining and maintaining Crocs' position in the market.  For example, if the '789 patent were cancelled, Crocs would no longer be able to assert that patent in litigation against anyone.  Moreover, Crocs' perceived reputation as having the ability to threaten any of its competitors or their actual or potential customers would be drastically constrained. Further, Crocs' competitors would be able to enter the market by selling footwear that is designed around the '858 patent.  Upon information and belief, the agreement between Seamans

and Crocs was undertaken with the purpose of mitigating that risk and assisting Crocs with maintaining its monopoly.

222.     Upon information and belief, Seamans followed through with his agreement with Crocs.

223.     On June 17, 2013, Seamans signed a declaration which stated:  "I am the sole inventor of [the '789 patent]."  The declaration also stated that Seamans acknowledged that any willful false statements "are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that such willful false statements may jeopardize the application or any patent issued thereon."

224.     On July 29, 2013, Crocs filed the signed declaration by Seamans with the U.S. Patent Office along with a request to the U.S. Patent Office that it withdraw its rejection of the '789 patent.

225.     Neither Crocs nor Seamans have taken any steps to withdraw or correct the false declaration by Seamans.  Crocs continues to seek to benefit from the declaration, as it continues to argue to the U.S. Patent Office that the rejection of the '789 patent should be withdrawn.

226.     Absent action by this Court to enjoin and prevent Crocs and/or Seamans from benefitting from their conspiracy, there is a dangerous probability that Crocs will continue to benefit from the conspiracy by using the '789 patent to continue to obtain and/or maintain a monopoly in the relevant market for molded clog-type footwear products, including the power to set prices, reduce output, or exclude competition in the market.

227.     The conspiracy between Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis affects a substantial amount of interstate

commerce in the relevant market and constitute a conspiracy to monopolize in violation of Section 2 of the Sherman Act.  Their conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Instead, upon information and belief, its purpose and effect is to preserve and promote Crocs' monopoly position and market stranglehold, to the detriment of consumer welfare,  Plaintiffs, and to Crocs' other competitive rivals in the relevant market.

228.    The anticompetitive acts of Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis has caused substantial economic injury to Plaintiffs and has also injured competition in the relevant market by, *inter alia*, foreclosing, lessening, and eliminating competition and depriving buyers/distributors from securing lower-cost or higher-quality alternatives for molded clog-type footwear products.

229.    As described, for example, in paragraphs 69 through 74, this conduct has caused and produced antitrust injury, and unless enjoined by this Court, will continue to produce anticompetitive, exclusionary, and injurious effects upon competition in interstate commerce.

230.    The conduct of Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and Margolis has caused antitrust injury to Plaintiffs, the industry, and consumers.  Antitrust injury based upon a bad-faith patent prosecution claim and bad-faith assertion of the impermissibly broadened scope of a patent grant is satisfied by (1) loss of customers, and (2) costs incurred in defense of the prior patent infringement suit and subsequent defensive efforts because such losses and costs are injuries which flow from the antitrust wrong.

231.    By reason of, and as a direct and proximate result of the conspiracy between Crocs, Seamans, Boedecker, Reddyhoff, Smach, Hart, Croghan, Marks, McCarvel, Snyder, and

Margolis, Plaintiffs have suffered and will continue to suffer financial injury to its business and property.  As a result, Plaintiffs have been deprived of revenue and profits they would have otherwise made, suffered diminished market growth, and sustained a loss of goodwill.

## FIFTH CLAIM FOR RELIEF

**UNLAWFUL EXCLUSIONARY ARRANGEMENTS, AGREEMENTS AND CONDUCT IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14), SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) AND/OR SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) (against Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder**

232.     Plaintiffs hereby reallege and incorporate by reference each of the allegations set forth in paragraphs 1 through 231 above.

233.     The elements for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), are enumerated above.

234.     Section 3 of the Clayton Act (15 U.S.C. § 14), makes it unlawful, *inter alia*, "[f]or any person . . . to lease or make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor . . . of the lessor or seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly" in the relevant market.  Under Section 3, the conditioning of the offer, allowance, or payment of rebates or discounts to preclude or exclude the use of a competitors' products is also unlawful.  *Id.*  Arrangements and contracts whose probable effect is to foreclose competition in a substantial share or segment of the line of commerce affected violate Section 3.

235.     The relevant product market for antitrust purposes in this case is defined as

molded clog-type footwear products.  The relevant geographic market for antitrust purposes is the United States.

236.    Crocs dominates the market for molded clog-type footwear products in the United States, and upon information and belief, possesses a market share greater than 90%.

237.    As described in paragraph 155, there are significant and high barriers to the relevant market entry that prevent other manufacturers from meaningfully entering or expanding in the relevant market.

238.    Plaintiffs have the requisite standing to assert antitrust claims because they are competitors of Crocs and participants in the relevant market and have suffered damages as a direct result of the actions of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder.

239.    Upon information and belief, Crocs' anticompetitive scheme to substantially lessen competition and create a monopoly in the above-described trade and commerce has been executed with the clear intent to specifically eliminate Plaintiffs as viable competitors and threat to Crocs' molded clog-type footwear products business and to suppress competition in general.

240.    Upon information and belief, Crocs' overall anticompetitive scheme consists of at least the following acts, which must be viewed as a whole:

(a)    Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder successfully threatened, intimidated, and coerced actual and potential purchasers of Plaintiffs' footwear products not to deal with

Plaintiffs or participated in, ratified, or acquiesced in the decision to threaten, intimidate, or coerce actual and potential purchasers of Plaintiffs' footwear products not to deal with Plaintiffs;

(b)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder induced, organized, and implemented a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Plaintiffs' footwear products, or participated in, ratified, or acquiesced in the decision to induce, organize, or implement a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Plaintiffs' footwear products;

(c)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder conditioned the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Plaintiffs, or or participated in, ratified, or acquiesced in the decision to condition the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Plaintiffs;

(d)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich,

Reddyhoff, Rees, Ribatt, Smach, and Snyder entered into actual or de facto/implied exclusive dealing arrangements with various customers, or participated in, ratified, or acquiesced in the decision to enter into actual or de facto/implied exclusive dealing arrangements with various customers; and

(e)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder have entered into agreements that prevent Crocs' customers from selling products "similar" to Crocs, or participated in, ratified, or acquiesced in the decision to enter into agreements that prevent Crocs' customers from selling products "similar" to Crocs.

241.   Exclusive dealing arrangements have the effect of inducing or coercing a buyer to purchase most, or all, products for a period of time from one supplier.  The arrangement may take the form of a requirements contract committing the buyer to purchase all (or a substantial portion) of its requirements of a specific product only from one supplier.  Such unlawful arrangements also include pricing or rebate policies that create a substantial disincentive to purchase products from competitive sources.

242.   Exclusionary arrangements do not actually have to prescribe exclusivity to be deemed unlawful.  Such "de facto" arrangements, understandings, or contracts are anticompetitive if they create or maintain market power resulting in the exclusion of rivals.

243.   Exclusionary arrangements or contracts can be found illegal, even though the contract or arrangement does not contain specific agreements *not* to use the products of a competitor, if the practical effect is to prevent such use or purchase.  Further, contracts or

arrangements utilized by a monopolist that provide price discounts or rebates to induce a buyer to purchase most, or all, of their product needs, but do not require absolute exclusivity, are also unlawful de facto exclusive dealing arrangements.  Upon information and belief, such arrangements were entered into or resulted from the relationship between Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, and many retailers throughout the United States, including Academy Sports, and others, who informed Plaintiffs that the reason they would not carry Plaintiffs' products is because of agreements with Crocs.

244.    The anticompetitive and exclusionary conduct of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder described herein is not motivated or driven by technological or efficiency interests and has no valid or legitimate business justification or procompetitive effects.  Rather, upon information and belief, its purpose and effect is to ensure that Plaintiffs and other competitive rivals in the relevant market cannot successfully invade or erode Crocs' dominant and entrenched market position.

245.    During the relevant time period, Crocs and Plaintiffs have both designed, manufactured, marketed, and sold molded clog-type footwear products in the United States.  The marketing, distribution, and sale of such products directly involves, and substantially affects, interstate commerce.  The violations of the Clayton and Sherman Acts alleged herein adversely, directly and substantially affect the flow of such products in interstate commerce.

246.    As described in paragraphs 69 through 74, the conduct of Crocs and Conspirator

Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder has caused and produced antitrust injury, and unless enjoined by this Court, will continue to produce anticompetitive, exclusionary and injurious effects upon competition in interstate commerce.

247.    The practices of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, described above, have foreclosed competition in a substantial share of the relevant market and/or have substantially suppressed competition or tended to create a monopoly for Crocs in the relevant market.

248.    The exclusionary agreements, arrangements, or contracts by Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder have caused antitrust injury to Plaintiffs, the industry, and to consumers.  Conduct that restricts consumer choice and/or makes the market unresponsive to consumer preference harms consumers and results in antitrust injury.  When an agreement detrimentally changes the market makeup and limits consumers' choice to one source of output, this causes cognizable antitrust injury of preventing its victims from making free and unhindered choices between market alternatives.

249.    The exclusionary conduct of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder has caused antitrust injury to Plaintiffs, to the industry, and to consumers.

250. By reason of, and as a direct and proximate result of, the practices and conduct of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, Plaintiffs have suffered, and will continue to suffer, financial injury to their business and property. As a result, Plaintiffs have been deprived of revenues and profits they would have otherwise made, Plaintiffs have suffered diminished market growth, and Plaintiffs have sustained a loss of goodwill.

## SIXTH CLAIM FOR RELIEF

**INTENTIONAL INTERFERENCE WITH BUSINESS ADVANTAGE**
**(against Crocs and Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder)**

251. Plaintiffs reallege and incorporate by reference each of the allegations of paragraphs 1 through 250 above.

252. Upon information and belief, Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder have intentionally, through improper anticompetitive conduct, interfered with the business of Plaintiffs, by at least the following:

(a) Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snydersuccessfully threatened, intimidated, and coerced actual and potential purchasers of Plaintiffs' footwear products not to deal with Plaintiffs or participated in,

ratified, or acquiesced in the decision to threaten, intimidate, or coerce actual and potential purchasers of Plaintiffs' footwear products not to deal with Plaintiffs;

(b)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyderinduced, organized, and implemented a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Plaintiffs' footwear products, or participated in, ratified, or acquiesced in the decision to induce, organize, or implement a refusal to deal among buyers/distributors, including Academy Sports and others, not to distribute or purchase Plaintiffs' footwear products;

(c)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder conditioned the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Plaintiffs, or or participated in, ratified, or acquiesced in the decision to condition the payment or allowance of discounts and rebates provided on the purchase of Crocs' footwear products, on an agreement not to deal with or purchase competitive products from Plaintiffs;

(d)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder entered into actual or de facto/implied exclusive dealing arrangements with various customers, or participated in, ratified, or acquiesced in the decision to enter into actual or de facto/implied exclusive dealing arrangements with various customers; and

(e)     Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder have entered into agreements that prevent Crocs' customers from selling products "similar" to Crocs, or participated in, ratified, or acquiesced in the decision to enter into agreements that prevent Crocs' customers from selling products "similar" to Crocs.

253.     Upon information and belief, the actions of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder prevented Plaintiffs from continuing to sell or acquiring new business to sell certain footwear models throughout the United States.

254.     Upon information and belief, as a direct and proximate result of the fraudulent, willful, knowing, and intentional interference of Crocs and Conspirator Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, Plaintiffs have suffered and will continue to suffer direct, incidental and consequential damages.

## SEVENTH CLAIM FOR RELIEF

**VIOLATION OF SECTION 43(a) OF THE LANHAM ACT**
**(against Crocs and Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder)**

255.     Plaintiffs reallege and incorporate by reference each of the allegations of paragraphs 1 through 254 above.

256.     Since 2002, Crocs and Conspirator Defendants Boedecker, Hanson, Croghan,

Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich,

Reddyhoff, Rees, Ribatt, Smach, and Snyder, have been misleading the public and consumers by

claiming that Crocs footwear is made of an exclusive and proprietary closed-cell resin that they

call "Croslite," when, in fact, "Croslite" is merely the common ethyl vinyl acetate used by many

footwear companies around the world, including Double Diamond, USA Dawgs, FOAM, and,

upon information and belief, many others.  Examples of particular claims Crocs is currently

making are provided in paragraph 22 above.

257.    Crocs' statements referring to the closed-cell resin that they call "Croslite" as

"exclusive," "proprietary," and/or "patented" in its promotional materials are disseminated by

Crocs, including on its own website that is accessible from anywhere in the United States, to

erroneously induce customers or potential customers that (1) Crocs' molded footwear is made of

a material that is different than any other footwear; and/or that (2) Crocs owns the rights to such

material.

258.    Upon information and belief, Crocs has placed such false and misleading

promotional statements in interstate commerce.  Upon information and belief, Conspirator

Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis,

Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, authorized,

directs, or participated in Crocs' decision to place such false and misleading promotional

statements in interstate commerce.

259.    Upon information and belief, Crocs' statements referring to the material from

which Crocs' molded footwear is made as "exclusive," "proprietary" and/or "patented" are false

and misleading and violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

260.    Crocs' false and misleading promotion explicitly and implicitly attempts to, and does, deceive consumers and potential consumers into believing that all other molded footwear, including molded footwear sold by Double Diamond and USA Dawgs, is made of inferior material compared to Crocs' molded footwear.

261.    Plaintiffs have no adequate remedy at law for Crocs' false and misleading statements.

262.    Unless Crocs is enjoined by this Court and ordered to retract and correct is false and misleading claims, these advertising and promotional activities will cause Plaintiffs to suffer a loss of consumer confidence, sales, profits, and goodwill, and will irreparably injure Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE,  Plaintiffs Double Diamond and USA Dawgs respectfully request that this Court enter an Order and Judgment in their favor and against Defendants Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, McCarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder on their causes of action, and:

A.  Adjudge and decree that the conduct alleged in Count I herein be adjudged to be unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

B.  Adjudge and decree that the conduct alleged in Count II herein be adjudged to be an unlawful attempt to monopolize in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

C.  Adjudge and decree that the conduct alleged in the Count III herein be adjudged to be in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

D.  Adjudge and decree that the conduct alleged in the Count IV herein be adjudged to be in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

E.  Adjudge and decree that the conduct alleged in the Count V herein be adjudged to be in violation of Section 3 of the Clayton Act (15 U.S.C. § 14) and/or Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2);

F.  Adjudge and decree that, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Plaintiffs are entitled to reasonable attorneys' fees and costs;

G.  Adjudge and decree that, pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), the anticompetitive and exclusionary conduct of Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, Mccarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder , be permanently enjoined;

H.  Issue a permanent injunction ordering Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, Mccarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder, their agents, servants, employees, representatives, subsidiaries and affiliates refrain from directly or indirectly using in commerce or causing to be published or otherwise disseminated any promotional materials or activities containing any claim that the material from which Crocs' molded footwear is made is "proprietary," "exclusive," or "patented;"

I.  Issue a permanent injunction directing Boedecker, Hanson, Croghan, Frasch, Hart, Hoverstock, Lasher, Lococo, Margolis, Marks, Melwani, Mccarvel, Rebich, Reddyhoff, Rees, Ribatt, Smach, and Snyder to place appropriate corrective advertisements, reasonably designed to reach all persons to whom the Crocs

advertisements and communications were directly or indirectly disseminated, and retracting the false, misleading, and unfair claims contained in those advertisements and oral statements;

J.   Adjudge and decree that this is an "exceptional case" due to the willful nature of Crocs' false and misleading promotion;

K.   Award Double Diamond and USA Dawgs damages in an amount to be determined at trial;

L.   Award Double Diamond and USA Dawgs treble damages pursuant to 15 U.S.C. §15;

M.   Award Double Diamond and USA Dawgs costs;

N.   Award Double Diamond and USA Dawgs attorneys' fees;

O.   Award Double Diamond and USA Dawgs any such other and further relief as this Court may find just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to their claims.

Dated:  August 5, 2016

/s/  David J. Kaplan
David J. Kaplan
Brian J. Elliott
Mitchell C. Shapiro
4120 W Windmill Ln, Ste 106
Las Vegas, NV 89139
Tel.:    702.260.1060
Fax:    702.260.1606
Email: dkaplan@usadawgs.com
Email: bje@brianelliottlaw.com
Email: mcs@usadawgs.com

*Attorneys for Plaintiffs U.S.A.
Dawgs, Inc. and Double Diamond
Distribution, Ltd.*